

**IT IS ORDERED as set forth below:**

**Date: October 14, 2020**

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 18-71778-WLH |
| STEPHEN D. KING, | CHAPTER 11 |
| Debtor, | |

| | |
|---|---|
| STEPHEN D. KING, | ADVERSARY PROCEEDING |
| Plaintiff, | NO. 19-5026-WLH |
| v. | |
| DAN SKOLNESS, ET AL., | |
| Defendants. | |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINITFF'S MOTION FOR SUMMARY JUDGMENT

1

This case arises from the Defendants' investment in a company to bring iron ore from a Chinese mine. Debtor Stephen King ("King" or "Debtor") was the CEO of the company. Defendants lost their investment and seek to hold King personally liable. The posture of this case is atypical. The motion before the Court is King's Motion for Summary Judgment on his complaint and the Defendants' counterclaims, seeking to determine he is not liable to the Defendants and, even if he is, such claims are dischargeable.[1]

### *Jurisdiction*

The Defendants' ("Minnesota Parties") Answer and Counterclaim denies that this Court has jurisdiction of this matter and that venue is proper. They assert as an affirmative defense that the Court does not have subject matter jurisdiction of "some" claims, although which ones are not identified. They assert the Court is not authorized to enter final judgment under the principles of Stern v. Marshall, 564 U.S. 462 (2011).

Bankruptcy courts are courts of limited jurisdiction and federal courts have an independent duty to inquire into subject matter jurisdiction. Galindo-Del Valle v. Attorney Gen., 213 F.3d 594, 598 n.2 (11th Cir. 2000). Bankruptcy courts have subject matter jurisdiction over "civil proceedings arising under title 11, or arising in or related to cases under title 11." See 28 U.S.C. § 1334(a)(b); see also LR 83.7A, NDGa. "Arising under" jurisdiction involves "a substantive right created by the Bankruptcy Code," while "arising in" jurisdiction pertains to claims that are "not based on any right expressly created by title 11, but nevertheless could have no existence outside of bankruptcy." Grausz v. Englander, 321 F.3d. 467, 471 (4th Cir. 2003). Typically, the facts giving rise to a claim "arising in" a bankruptcy case occur during the course of the bankruptcy case. See Mercer v. Allen, 2014 WL 185252 (M.D. Ga. Jan. 15, 2014); In re Taylor, 2006 WL

---

[1] A Suggestion of Death was filed on September 21, 2020 after this matter was fully briefed and argued.

6591616 (Bankr. N.D. Ga. May 4, 2006). "Related to" jurisdiction exists over proceedings where the outcome "could alter the debtor's rights, liabilities, options, or freedom of action" and would "impact[] upon the handling and administration of the bankrupt estate." Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.), 910 F.2d 784, 788 (11th Cir. 1990).

After jurisdiction is established, the next question is whether the cause of action is "core". Core proceedings are set out in 28 U.S.C. § 157(b)(2)(B). The fact that a proceeding is a statutorily core proceeding, however, does not necessarily mean that this Court has the constitutional authority to determine it. Stern, 564 U.S. 462. A matter is constitutionally core if "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." Stern, 564 U.S. at 499. Bankruptcy courts may enter final orders only in those matters that are constitutionally "core." When a bankruptcy court lacks constitutional authority to determine a proceeding, however, the remedy is not dismissal for lack of jurisdiction. Instead, the bankruptcy court may hear the matter and issue proposed findings of fact and conclusions of law for *de novo* review by the district court under 28 U.S.C. § 157(c)(1). Executive Benefits Insurance Agency v. Arkison, 573 U.S. 25 (2014).

Even if the question of the court's constitutional authority is raised, the Court may not need to decide it at the summary judgment stage. As one court said,

> It is immaterial to this Court's job in this proceeding whether it [ . . .] determines the issues or only hears them [and submits proposed findings and conclusions]. With regard to the motion for summary judgment, the Court can only decide issues of law based on undisputed facts. The District Court will review any such result *de novo* regardless of the Court's authority, so [a determination of authority] does not matter. If the matter proceeds to trial, the Court's tasks are to decide disputes of fact and to apply the law. From the Court's standpoint, whether the result of the Court's work is the *determination* of those factual and legal issues or a *proposed* determination of them, the Court's work is the same. Determination of the Stern issue, therefore, is immaterial to how this matter proceeds in this Court.

Avila v. Long (In re Avila), 2020 WL 5105182, at *2 (Bankr. N.D. Ga. Aug 28, 2020).

With this jurisdictional background, the Court must review the causes of action to be considered.  The complaint in this case asserts three causes of action: a declaratory judgment that King is not liable to the Minnesota Parties on the claims they assert, a determination that such claims are dischargeable, and an injunction against the Minnesota Parties continuing the litigation in Minnesota State Court.  The counterclaim asserts that the Minnesota Parties' claims are non-dischargeable.

The bankruptcy courts have jurisdiction to grant declaratory judgments.  The Declaratory Judgment Act, 28 U.S.C. § 2201 states "[i]n a case of actual controversy within its jurisdiction ... any court of the United States. . . may declare the rights and other legal relations of any interested party seeking such declaration. . . ."  "Bankruptcy courts are among the federal courts that may grant declaratory relief under this statute."  In re City of Cent Falls, R.I., 468 B.R. 36, 44 (Bankr. R.I. 2012).  But, "[t]he Declaratory Judgment Act does not itself confer subject-matter jurisdiction.  Rather, it makes available a declaratory remedy for disputes that come within the court's jurisdiction on some other basis."  Id. at 48.  Here, the request is to declare the rights of the Debtor and the Minnesota Parties with respect to their claim in this bankruptcy case.  Since the filing of this adversary proceeding, the Minnesota Parties have filed a proof of claim asserting the very same claims on which King seeks a declaratory judgment.  Adjudication of claims in a bankruptcy case is a matter that arises under section 502 of the Bankruptcy Code and is therefore a matter over which the court has jurisdiction under 28 U.S.C. §§ 1334 and 157.  Adjudication of claims in a bankruptcy case is also a core matter under 28 U.S.C. § 157(b)(2)(B).  See In re Alternate Fuels Inc, 2010 WL 3490260, *4 (D. Kan. Aug. 26, 2010).  Since adjudication of claims is a core matter arising under title 11 and in the bankruptcy case, and the claims allowance process was recognized by the Stern court as constitutionally core, the Court has authority to hear and determine and enter

a final order with respect to it. <u>Cent Falls</u>, 468 B.R. at 49; <u>Schmid v Bank of America (In re Schmid),</u> 494 B.R. 737, 744 (Bankr. W.D. Wis. 2013); <u>In re Simon</u>, 606 B.R. 695, 698 (Bankr. W.D La. 2019).

King also asks the Court to determine the dischargeability of the Minnesota Parties' claims. This issue is also raised in the Minnesota Parties' counterclaim seeking a determination of dischargeability. Discharge is an issue that only arises under the Bankruptcy Code and the Court therefore has jurisdiction under 28 U.S.C. §§ 1334 and 157 to hear it. Determination of the dischargeability of debts is a core matter under 28 U.S.C. §157(b)(2)(I), is fundamental to the bankruptcy system, and is a matter on which the Court can enter a final order. <u>De La Rosa v Kelly (In re Kelly),</u> 582 B.R. 905, 908-09 (Bankr. S.D. Tex. 2018).

Finally, King asks the Court to enjoin the Minnesota Parties from pursuing claims in state court. Effectively, this is a request by the Debtor to enforce the automatic stay. The automatic stay only arises under the Bankruptcy Code and the Court has jurisdiction to hear matters related to its effect and enforcement. Matters regarding the automatic stay are core proceedings under 28 U.S.C. § 157(b)(2)(G). The Court has authority to enter a final judgment as to such cause of action since the automatic stay arises from the bankruptcy case itself. <u>In re Williams</u>, 545 B.R. 917, 923 (Bankr. S.D. Tex. 2016).

The Minnesota Parties also assert that venue of this action is improper. The assertion is incorrect. "[A] proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending". 28 U.S.C. § 1409(a). The Northern District of Georgia is the appropriate venue for this adversary proceeding.

***Evidentiary Issues***

Before setting out the undisputed facts in this case, the Court must consider several evidentiary issues raised by the parties.  By separate orders, the Court has sustained the objections of the Debtor to certain portions of two affidavits of John Mahoney.

1.  "Sham" Affidavits

The Debtor has raised concerns about the affidavits of Bryan Reichel ("Reichel") and the Minnesota Parties and asserts they should not be considered to the extent they are inconsistent with deposition testimony.  A party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.  Baer v. Chase, 392 F.3d 609, 623–24 (3d Cir. 2004).  When a party does not explain the contradiction between the subsequent affidavit and the prior deposition, the alleged factual issue in dispute can be perceived as a "sham."  Id.  Under the "sham affidavit" doctrine, a court can disregard "an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony."  Id. (citations omitted).  As explained in Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 577–78 (2d Cir. 1969),

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

Id. at 578; see also Van T. Junkins and Assocs. v. U.S. Industries, 736 F.2d 656 (11th Cir. 1984).

A distinction must be made, however, between discrepancies that create transparent shams and discrepancies that create an issue of credibility or go to the weight of the evidence.  Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986).  "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended.  To allow every failure of

memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness . . . was stating the truth." Tippens, 805 F.2d at 953–54.   Variations in a witness's testimony and failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight, if credited at all.  Id. at 954.

As the court noted in In re Sciortino, "at the summary judgment stage the Court 'must not resolve factual disputes by weighing conflicting evidence.'" 561 B.R. 260, 264 (Bankr. N.D. Ga. 2016); see also Sims v. Morris (In re Morris), 185 B.R. 939, 944-45 (Bankr. N.D. Ga. 1994). Instead, issues of credibility must be determined following an opportunity for the court to observe the demeanor of the defendant as he or she testifies in open court.  "If a party raises questions about the accuracy of an affidavit, the court must determine whether any errors or discrepancies create a transparent sham or rather raise issues of credibility.  Only those affidavits shown to be shams may be disregarded."  Sciortino, 561 B.R. at 264 (citing Tippens, 805 F.2d at 953).  An affidavit may only be disregarded as a sham "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  Van T. Junkins, 736 F.2d at 657.  Thus, an affidavit should not be disregarded merely because there is a discrepancy between deposition testimony and the deponent's later affidavit.  Kennett–Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir. 1980); see Choudhry v. Jenkins, 559 F.2d 1085, 1090 (7th Cir. 1977); see also Tippens, 805 F.2d at 954.  Furthermore, "the court may consider any admissible facts and disregard any inadmissible statements occurring in the same affidavit."  Sciortino, 561 B.R. at 264 (citing Devan

v. Zamoiski Southeast, Inc. (In re Merry–Go–Round Enter., Inc.), 272 B.R. 140, 145 (Bankr. D. Md. 2000); Peterson v. Board of Trustees of the Univ. of Ala., 644 Fed. Appx. 951, 954 (11th Cir. 2016)).

King argues that Reichel's sworn affidavit states he spoke to every Minnesota Party except Reem Danial and Elizabeth Zbikowski prior to their loans to Wits Basin and told them King was not drawing a salary and their money would be used to pay expenses to reopen the mine in China. In his deposition, on the other hand, Reichel did not remember much in the way of details.  He said he was really just a courier picking up documents and facilitating document exchange.  For example:

Q. Do you remember any communications that you had with him [Dr. Tadros] about his investment?

A. No.  The information on his investment would be from King. I would, again, juggle paper, help him get stuff knocked down like it says here.  His documents got delivered to Dacko.

Q. Okay. So basically be – you would go pick up the documents, take them over to Wits Basin's office, something like that?

A. Yeah.  Another thing I want to tell you, when people ask me what do I think and stuff, sure.  But I, other than small talk, I would pretty much deliver stuff around. (p. 21)

……….

Q. And did you have any discussions with him [Mr. Zbikowski] about placing money with Wits Basin?

A. He would have had the money discussions with Steve, but I, again, was probably coordinating running around stuff, making sure they got documents.  I've talked to Mr. Zbikowski before.  But it was a long time ago.

Q. Do you know what that conversation was about?

A. We've talked about everything from pontoon boats to the cost of tires for his great big motor home. (p. 35)

Similarly, each affidavit of the Minnesota Parties is almost identical in saying that King and Reichel represented that the money invested was to be used to fund operations at an ore mine in China; that King was not taking or receiving any compensation in any form and would not receive payment of any kind until all the Notes (defined below) were paid; and that Reichel was not being paid any fees or commissions. The depositions of the Minnesota Parties are less clear on these points according to King.

While certainly the flavor of the affidavits and depositions are inconsistent and those inconsistencies may be relevant to the credibility of the witnesses' affidavits or the weight given to the affidavits, the Court cannot say the answers to the deposition questions were unambiguous answers to clear questions or that the affidavits are directly contradictory. The distinctions between the two are as to memory, focus, and, to some extent, the questions asked. For that reason, the Court will consider the affidavits of Reichel and the Minnesota Parties.

2. <u>Responses to Statements of Undisputed Facts</u>

The parties' responses to each other's statement of material undisputed facts and the effect thereof are also in dispute. King filed a statement of material facts, to which the Minnesota Parties responded and raised many objections. The Minnesota Parties, however, failed to specifically admit or deny many of King's statements. King likewise responded to many of the additional facts presented by the Minnesota Parties with general objections.

Federal Rule of Civil Procedure 56(e) provides a court may consider a fact undisputed for purposes of summary judgment when a party fails to support an assertion of fact or fails to properly

address another party's assertion of fact as required by Rule 56(c).  Fed. R. Civ. P. 56(e)(2); see, e.g., Ehrlich v. Global (In re Hoffmans Trade Group LLC), 2017 WL 2633528, at *2 nn.3-4 (N.D.N.Y. June 19, 2017).   Many local rules, including those applicable here, also deem uncontroverted facts admitted for summary judgment purposes.  Bankruptcy Local Rule 7056-1(a)(2) provides "[a]ll material facts contained in the moving party's statement that are not specifically controverted in respondent's statement are deemed admitted."  BLR 7056-1(a)(2). Bankruptcy local rules "have the force of law," In re Milani, 2019 WL 4584152, at *3 (Bankr. N.D. Ga. Sept. 19, 2019) (citations omitted), and failure to comply with such local rules "is not a mere technicality."  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).  When a responding party fails to comply with applicable local rules requiring a specific response, and the moving party's undisputed facts are therefore deemed admitted, "a district court [is] to disregard or ignore evidence relied on by the respondent—but not cited in the movant's statement of undisputed facts—that yields facts contrary to those listed in the movant's statement."  Garmley v. Cochran, 651 F. App'x 933, 937 (11th Cir. 2016) (alteration in original) (quoting Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008)).

Deeming facts admitted, however, does not automatically entitle the movant to summary judgment.  After deeming the movant's statement of undisputed facts to be admitted, the "court must then review the movant's citations to the record to 'determine if there is, indeed, no genuine issue of material fact.'"  Reese, 527 F.3d at 1269 (quoting United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., 363 F.3d 1099, 1103 n.6 (11th Cir. 2004)).  That is because facts are only "deemed admitted . . . to the extent [that they are] supported by specific references to the [record]."  One Piece of Real Prop. Located at 5800 SW 74th Ave., 363 F.3d at 1103 n.6 (alteration in original); see also Aponte v. Royal Caribbean Cruise Lines Ltd., 739 F. App'x 531, 535 (11th

Cir. 2018). The Court must review the citations to the record to determine if there is, indeed, no genuine issue of material fact. Reese, 527 F.3d at 1269. If evidentiary materials submitted with a motion for summary judgment conflict with factual allegations in the movant's statement of undisputed material fact, or are not supported by the record, even if the non-movant has not responded, the Court is under no obligation to accept such allegations as true. Reid v. Hasty, 2009 WL 10711917, at *2 (N.D. Ga. Nov. 5, 2009), report and recommendation adopted as modified, 2010 WL 11647079 (N.D. Ga. Jan. 7, 2010) (citing Fed. R. Civ. P. 56(e)). Therefore, while undisputed material facts are deemed admitted to the extent they are supported by evidentiary materials, the Court has an obligation to determine whether the evidentiary materials create any issues of material fact and should not blindly accept such undisputed facts as true.

While the Minnesota Parties' Response to Debtor's Statements of Undisputed Material Facts and Debtor's Response to the Minnesota Parties' Statement of Facts do not always state whether the facts are disputed or undisputed, both are rife with evidentiary objections. Federal Rule of Civil Procedure 56(c)(2) provides a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, and the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. On summary judgment, courts can also consider evidence that is not currently in an admissible form so long as it is reducible to an admissible form. As the Supreme Court explained in Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986), a nonmoving party seeking to defeat summary judgment can oppose summary judgment with any of the evidentiary materials listed in Federal Rule of Civil Procedure 56(c); the evidence does not have to be in a form that would be admissible at trial. Rule 56(e) requires only that evidence "*would* be admissible," not that it presently *be* admissible. Fed. R.

Civ. P. 56(e) (emphasis added); see also Denney v. City of Albany, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001); The Lamar Co., L.L.C. v. City of Marietta, Ga., 538 F. Supp. 2d 1366, 1377 (N.D. Ga. 2008) ("The court notes that it may consider unauthenticated documents on a motion for summary judgment if it is apparent that they will be admissible at trial."); Davis v. Houston County, Ala., Bd. of Educ, 2008 WL 410619, *3-4 (M.D. Ala. Feb. 13, 2008) (considering medical record on summary judgment since it could be reduced to admissible form at trial, and noting that "[o]n the face of the record, there is nothing that indicates the record is unusual or not kept in the ordinary course of business.").

A number of the objections to specific facts relate to relevance or materiality because the factual focus of the Minnesota Parties' claims has shifted.  Because they no longer intend to pursue claims based on certain facts, the Minnesota Parties say these facts are immaterial.  This is discussed in more detail below.  The fact that a statement may be irrelevant has no bearing upon a motion for summary judgment.  See McAllister v. Krengel Spamer & Vance, LLC (In re McAllister), 2014 WL 3955008, at *12 (B.A.P. 9th Cir. Aug. 13, 2014).  A bankruptcy court can award summary judgment only when there exists no genuine dispute of material fact.  The Court will determine what is material and it cannot rely on irrelevant facts; thus, relevance or materiality objections are redundant.  Id. (citing Burch v. Regents of the Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).

The Minnesota Parties object to statements made by King and documents attached to his declaration (Exs. J, G, M, N, O), as well as to statements made by Stephen Humphray ("Humphray") and Franklin Levy ("Levy"), as being inadmissible hearsay and legal conclusions. Certain statements are notably *not* hearsay and thus can be freely considered.  For example, out-of-court statements not offered to prove the matter asserted are not hearsay.  A party can therefore

testify as to his or her understanding or belief, rather than exactly what was said, without the statement constituting hearsay.  The statements alleged to be hearsay by the Minnesota Parties largely fall in this category and can be construed as being offered for the non-hearsay purpose of King's or Levy's understanding about CGMR's, MXM's (both as defined below), and Wits Basin's efforts to operate and generate interest in their ventures.  Further, the exhibits referenced can be identified by King as CEO of Wits Basin or MXM or CGMR.  The fact the documents exist is not hearsay.  The Court has also reviewed the alleged legal conclusions and determined that they could be admitted at trial as the declarants' understanding of the effect of the described transactions, which is permitted.

King objects to certain statements made by the Minnesota Parties regarding certain documents as not being the best evidence of the content of the documents.  More specifically, Debtor contends the loan agreement, Skolness Order, Cohan Order, complaint, CRM Order, CRM agreements, press releases, email, and portion of King's deposition transcript provide the best evidence of the content of the respective documents.  Where a proponent intends to prove the contents of a document, the document itself is the best evidence of that content.  Fed. R. Evid. 1002.  But when the contents of a writing are merely collateral to the case, Rule 1002 does not apply.  Fed. R. Evid. 1004(4).  The Court reviewed the documents in the record for their contents and will rely on the actual contents, rather than the summaries of the documents provided by the Minnesota Parties, in determining the undisputed facts.

The Court has reviewed the materials submitted in support of the Motion and in opposition to it and as supplemented.  (Docs. Nos: 36, 39, 40, 41, 42, 45, 46, 48, and 67.)  If the response was an evidentiary objection only (including relevance) but did not address the substance of the statement, the Court considered it undisputed in accordance with the local rules (unless the

evidence was excluded by the Court's Orders on the objections to the Mahoney affidavits). If the Court found support for the statement in the record, the Court has included it in the statement of undisputed facts below. If, however, the response pointed to conflicting evidence in the record, the Court considered the statement to be disputed, even if the party did not use the word "disputed."

***Undisputed Material Facts***

1. Roles and Compensation

Wits Basin Precious Minerals, Inc. ("Wits Basin") was a Minnesota corporation established originally under the name Meteor Industries, Inc. in December 1992. Wits Basin was a publicly traded company with about 4,000 shareholders. King joined the Wits Basin Board of Directors on July 8, 2004, as one of five directors. Also on the Board of Directors was Mark Dacko ("Dacko"). On January 27, 2005, the Wits Basin Board of Directors authorized it to enter into a consulting agreement with King. King abstained from the Board of Directors vote on this matter. Under the consulting agreement, King received $207,000 in 2005 and $80,000 in 2006. On May 12, 2006, the Board of Directors hired King to serve as president of Wits Basin. The Board of Directors also approved compensation to King of $5,000 per month and terminated the earlier consulting agreement. On September 15, 2006, King was appointed by the Board of Directors of Wits Basin to also serve as chief executive officer. At this point, King served as the president and CEO of Wits Basin and was on the Board of Directors and served in this role until at least 2016.

Deborah King was the sole owner of Corporate Resource Management, Inc. ("CRM"). The Debtor did not own any interest in CRM. On May 12, 2006, the Wits Basin Board of Directors authorized it to enter into a non-exclusive consulting agreement with CRM. CRM was to provide Wits Basin with certain investment banking services in connection with the purchase and/or sale of mining-related assets. The consulting agreement provided for payment of $10,000 per month

for the various services rendered under it, together with a commission rate of 2% of the aggregate net proceeds received by Wits Basin upon the closing of any asset transaction in which the consultant provided investment banking services.  The term of the CRM consulting agreement was to continue for successive one-year periods unless one of the parties provided sufficient notice of termination.  King abstained from the Board of Directors vote on the CRM consulting agreement. Deborah King was the sole officer of CRM.  She is not a lawyer or accountant, and she is not registered with the Securities and Exchange Commission ("SEC").

On May 28, 2008, the Compensation Committee of the Board of Directors of Wits Basin authorized Wits Basin to enter into a compensation agreement with King whereby he was to receive for each year of a three-year term an aggregate salary of $60,000 per year, an aggregate of $75,000 per year in lieu of benefits and certain stock options.  The Board approved a proposed written employment agreement with King incorporating these terms.  King did not participate in the vote for this compensation and approval of the employment agreement.  The Board of Wits Basin also discussed the possibility of an amended consulting agreement with CRM, but a fully executed final agreement is not included in the record.  King did not participate in the vote for his compensation or on the CRM consulting agreement.  King agrees that, between 2013 and 2015, Wits Basin made payments to him of $405,000, allegedly for compensation, payments to CRM of $495,000, pursuant to the consulting agreement, and reimbursement of expenses of $71,366.32, all of which totals $971,366.32.  Dacko, the chief financial officer of Wits Basin, made virtually all of the wire transfers to CRM in this time period.  Even though King acknowledges receiving some compensation from Wits Basin, Wits Basin never issued any check to King during the period 2013 to 2015, nor did it issue any W-2 or 1099 during that time period.  Wits Basin did not prepare or file any tax returns for the years 2012 through 2017.  Wits Basin was dissolved in 2017.

2. <u>Mine Acquisition and Operations</u>

In 2007, Wits Basin, through other companies, acquired an option to purchase the Xiaonanshan Mine ("XNS") in China from an individual named Mr. Lu.  Wits Basin paid $5 million for the rights.  The option was held by China Global Mining Resources Limited, a Hong Kong corporation ("CGMR") of which China Global Mining Resources (BVI) Limited ("BVI") was the sole shareholder.  Wits Basin was in turn the sole shareholder of BVI.  King was CEO of CGMR.  In 2008 and 2009, Wits Basin entered into a joint venture with London Mining, PLC ("London Mining") whereby London Mining would become effectively a 50% owner in CGMR and provide certain dollars in an account to be used to exercise the option.  CGMR exercised the option but understood London Mining would not release the funds to Mr. Lu.  This prompted Mr. Lu, the owner, to file suit, and he obtained a judgment on the XNS Mine for $12 million.  CGMR had Maanshan Xiaonanshan Mining Company ("MXM") acquire full mining rights and necessary permits and licenses for XNS on February 11, 2009.  King was CEO of MXM.  Due to the issues with London Mining and Mr. Lu, CGMR experienced serious difficulties in operating XNS and it ultimately closed in 2010.

Nevertheless, from June 2010 to June 2011, Humphray served as general manager of operations for CGMR and oversaw the day-to-day operations of the company.  He was present in China for six months, attempting to obtain the needed permits and reopen the mine.  In December 2011, London Mining sued Wits Basin in Minnesota, and Wits Basin filed a counterclaim.  Wits Basin was represented by Levy in the litigation.  In December 2013, the litigation with London Mining was settled.  As a result, London Mining transferred its interest in BVI to Wits Basin, which effectively made Wits Basin the sole ultimate shareholder of CGMR.  However, Wits Basin

16

transferred some of those shares to Levy to satisfy, at least in part, his outstanding bills for legal representation. Wits Basin remained the majority shareholder in CGMR.

CGMR contracted with the Anhui Zhonghai Mining and Trading Company ("AZMTC") for the purpose of reopening and operating the mine. AZMTC was terminated on May 28, 2014, but refused to vacate the XNS Mine, to turn over the books and records, or to turn over any equipment. Nevertheless, King conveyed optimistic reports, sending a letter to the Minnesota Parties on August 14, 2014 confirming a stockpile of shippable ore at the mine valued at $4-$5 million. Subsequently, on October 10, 2014, a new operator agreement was entered into with Maanshan Cijin Mining & Trading Co., Ltd. ("MCMT"). In the meantime, between January 1, 2014 and December 2014, iron ore prices plummeted in excess of 50% of their value in the preceding year. Despite the efforts of Wits Basin, the XNS Mine was not reopened.

3.   Fund Raising

While the legal issues with Mr. Lu and London Mining were ongoing, Wits Basin continued to seek funding. In late 2009, CGMR attempted to raise money through a public offering on the Hong Kong Stock Exchange. In 2009, Wits Basin filed a 10K with the SEC, which was signed by all the directors of Wits Basin. In August 2011, Wits Basin found what it believed to be a credit-worthy Chinese buyer who was willing to pay up to $100 million for an interest in CGMR. London Mining rejected the offer. In late 2013, Wits Basin engaged Daiwa Capital Markets Hong Kong Ltd. ("Daiwa") to act as an exclusive financial advisor in relation to proposed capital raising for CGMR. Wits Basin also engaged the law firms of Bryan Cave, LLP and DLA Piper in connection with the proposed fundraising transactions. In January 2014, King and Levy identified a state-owned entity as a potential lender or equity investor. Levy enlisted the negotiating assistance of former U.S. Ambassador Donald Ensenat, but this effort was unsuccessful. Wits

Basin also retained a company called Trihelix to assist it in fund raising.  Levy and King met with the principals of Trihelix several times, but ultimately the representation was not successful.  King and Levy and others traveled to China on more than one occasion for fund-raising efforts and inspection of the mine.

4.   <u>Notes and Investors</u>

In 2012, Wits Basin hired Marley, LLC ("Marley"), a company operated by Reichel, as a consultant to locate persons interested in making investments in or loans to Wits Basin.  Wits Basin paid Marley fees in return for locating the potential investors.  Neither Wits Basin nor King provided any documentation to the Minnesota Parties describing the payments to Marley.  From August 2012 through April 2015, the Minnesota Parties provided money to Wits Basin in return for which they received a note ("Note"), signed a subscription agreement, and received warrants to purchase stock in Wits Basin.  While all of the Notes are not identical, they are substantially the same, with the exception of a loan agreement between Defendant Steven M. Cohan and Jill R. Cohan, as Trustees of the Steven M. Cohan and Jill R. Cohan Joint Revocable Trust ("Cohan Trust") and Wits Basin.  Under the loan agreement, Steve Cohan agreed to advance funds under certain tranches for specified purposes and to advance certain expenses.  These advances and expenses are evidenced by three Notes with substantially similar terms as all other Notes.  With respect to each Note, the face amount of the note was usually two times or more the amount loaned or provided by the Minnesota Parties, the Notes generally had a 90-day maturity, and an 8% interest rate.  The Notes provided for default interest ranging from 18% to 100%.  Most of the Notes were signed by King on behalf of Wits Basin, although a number were signed by Dacko as Wits Basin's representative.  Several of the Notes were guaranteed by MXM.[2]

---

[2] Attached as Exhibit A is a list of Notes, showing the date of the Note, the amount paid for the Note, the face amount of the Note, the signatory on behalf of Wits Basin, and whether the Note was guaranteed.  The Note dated April 22,

In the subscription agreements, each of the individual Minnesota Parties swore that they had a net worth in excess of $1 million at the time they signed the respective subscription agreement. The Cohan Trust in its subscription agreements affirmed that it had assets in excess of $5 million controlled by a sophisticated person. Each of the Minnesota Parties has agreed that they are accredited investors. Further contents of the subscription agreement will be discussed later in connection with the claims of the Minnesota Parties.

The personal contact between King and the Minnesota Parties differed. King never met Reem Danial ("Danial") or spoke or communicated directly to her. King did not provide any information to Danial directly. King also never met Elizabeth Zbikowski. King did not have any direct communications with her. King and Dan Skolness ("Skolness") had only a few phone calls, and he never met Skolness in person. King only had some email communications with Edward Oertel and only two or three phone calls with Fred Williams ("Williams").[3] In fact, King did not know how to get in touch with Williams directly. Before making his first loan to Wits Basin, Steve Cohan did not speak directly with King, but instead spoke with Reichel. Subsequently, there was direct contact between King and Steve Cohan, and Steve Cohan traveled to China to view the mine.

The level of mining expertise of the investors varied as well, although most had some experience with mining or chemical companies. Skolness was and is involved in a biomass project located in China. Steve Cohan had experience with other business dealings in China. He was introduced to Wits Basin through John Oertel. Several of the investors were involved with the mining company known as Numax, which owned a mine in Canada. David Flod ("Flod"), John

---

2014 is payable to Julie Williams Barner, but the undisputed facts per the parties are that Fred John Williams paid $25,000 for that Note. Also, the Cohan Trust obligation of $18,913.58 is not evidenced by a Note but by the Cohan Trust loan agreement.
[3] Fred John Williams died in October 2017 and his estate is the party to this action.

Oertel, and Williams were all involved with Numax.  In 2014, John Oertel provided King with a Powerpoint presentation showing Numax's holdings to be worth several hundred million dollars. John Oertel indicated to King on several occasions that Wits Basin needed to remain in business and funded through the loans so that a deal with Numax could be realized.

Although he was not directly involved with Numax, Steve Cohan facilitated discussions between Numax, King and Wits Basin.  The potential of a transaction between Numax and Wits Basin is also evidenced in the Cohan Trust loan agreement of September 24, 2014, which provides that, by April 2015, the parties would enter into an agreement for Wits Basin to acquire shares in Numax.  If Wits Basin failed to do so, it would owe Numax $250,000.  The loan agreement contemplated joint explorations between Numax and Wits Basin.  In October 2014, Steve Cohan traveled to China and met with Daiwa, met with Levy and another Wits Basin representative in Shanghai, and visited the XNS Mine.  Steve Cohan subsequently drafted a trip report and shared it with several other of the Minnesota Parties.  Steve Cohan also edited several of the trip reports and XNS Mine status updates prepared by King that were provided to other Minnesota Parties.

Finally, the Minnesota Parties performed varying levels of due diligence before providing funds to Wits Basin.  George Tadros ("Tadros"), who first made a loan to Wits Basin in 2012, did no independent research other than looking at Wits Basin's website.  He spoke with King, but did not consult with anyone else, an attorney or an accountant, prior to making his loans to Wits Basin. He did no research into whether the XNS Mine was operating.  Similarly, Skolness did not consult with anyone prior to making a loan to Wits Basin and never performed any independent research. Flod conducted virtually no research on Wits Basin other than googling it prior to making his loans to Wits Basin.  Williams also never performed any independent research prior to making any loan to Wits Basin.  Scott Zbikowski never hired an attorney, financial advisor or did any independent

20

research prior to making his loans. John Oertel spoke with some of the other Minnesota Parties before making his loans and pulled some of the SEC reports, but did no other independent research before investing in the company. Daljit Sikka ("Sikka") attended various hearings in the London Mining litigation and interviewed Levy about the status and process of the litigation. Steve Cohan did not perform any independent research before his initial investment other than looking at the Wits Basin website and the SEC filings and talking to the other Minnesota Parties. In mid-2015, Steve Cohan requested that King personally guarantee one of the loans. King declined, but Steve Cohan nevertheless made the loan. No payments were ever made by Wits Basin on any of the Notes. Nevertheless, all of the Minnesota Parties loaned new funds to Wits Basin, even when the prior Notes were in default.

5.  <u>State Court Litigation</u>

Skolness commenced an action against Wits Basin and King in Minnesota State Court on October 9, 2017. The complaint alleged claims for breach of contract on the unpaid Notes, sale of unregistered securities, fraud in the offer and sale of securities, aiding and abetting liability under the Minnesota Securities Act, control person liability under the Minnesota Securities Act, common law fraud, and civil theft. On January 2, 2019, the Minnesota State Court entered an Amended and Restated Order granting a default judgment against Wits Basin only on the breach of contract action. The court reserved for trial all claims against King and all remaining claims against Wits Basin.

On July 21, 2017, the Cohan Trust, Steven M. Cohan, John Oertel, Fred John Williams, Jr., David L. Flod, Scott and Elizabeth Zbikowski, and Edward J. Oertel ("Cohan Plaintiffs") also filed suit against Wits Basin and King in the Minnesota State Court. The Cohan Plaintiffs also sought judgment for breach of contract as to the promissory Notes and the loan agreement, sale of

unregistered securities, fraud in the offer and sale of securities, aiding and abetting liability under the Minnesota Securities Act, control person liability under the Minnesota Securities Act, common law fraud, and civil theft. On January 2, 2019, the Minnesota State Court entered an Amended and Restated Order granting partial default judgment only against Wits Basin and only as to the claim for breach of contract on the Notes, but not on the loan agreement identified in the Cohan Plaintiffs' complaint. The court also reserved for trial the issue of whether they could recover 100% interest. The court reserved for trial all claims against King and all remaining claims against Wits Basin.

Finally, Sikka, Tadros and Danial filed a complaint on July 30, 2018, also against Wits Basin and King and also alleging claims for breach of contract as to the promissory Notes, sale of unregistered securities, fraud in the offer and sale of securities, aiding and abetting liability under the Minnesota Securities Act, control person liability under the Minnesota Securities Act, common law fraud, and civil theft. No judgment has been entered against Wits Basin or King in this action. A trial was scheduled for January 7, 2019 in Minnesota State Court on the Cohan Plaintiffs and Skolness complaints.

6. <u>Bankruptcy</u>

King filed this bankruptcy case on December 31, 2018. After an unsuccessful attempt by King to remove the Minnesota State Court cases to the District Court and then have them transferred to this Bankruptcy Court, the Debtor filed this action for declaratory judgment that he is not liable to the Minnesota Parties on any of the claims asserted in the state court litigation, that such claims are dischargeable regardless of his liability, and requesting an injunction against further action in the Minnesota State Court. Thereafter, the Minnesota Parties, filed a proof of claim in King's bankruptcy case attaching all three state court complaints and asserting all of the

same claims asserted in the state court actions.  The Minnesota Parties moved for relief from the

stay to continue the state court litigation.  The motion was denied without prejudice to renewing

the motion if this Court denied summary judgment to King in this action.

### *__Summary Judgment__*

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law".  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c); Fed. R. Bankr.

P. 7056(c).  "The substantive law [applicable to the case] will identify which facts are material."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary

judgment has the burden of proving there are no disputes as to any material facts.  Hairston v.

Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993).  A factual dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,

477 U.S. at 248.  The party moving for summary judgment has "the initial responsibility of

informing the . . . court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits if any

which it believes demonstrate the absence of a genuine issue of material fact."  United States v.

Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (alteration in original) (quoting

Celotex Corp., 477 U.S. at 323).  What is required of the moving party, however, varies depending

on whether the moving party has the ultimate burden of proof on the issue at trial.

> When the nonmoving party has the burden of proof at trial, the moving party is not
> required to "support its motion with affidavits or other similar material negating the
> opponent's claim" (cites omitted) in order to discharge this "initial responsibility".
> Instead, the moving party simply may "show – that is, point out to the … court –
> that there is an absence of evidence to support the nonmoving party's case." (cites
> omitted).  Alternatively, the moving party may support its motion for summary

judgment with affirmative evidence demonstrating that the nonmoving party will
be unable to prove its case at trial.

Four Parcels of Real Prop., 941 F.2d at 1437-38 (emphasis omitted) (citing Celotex, 477 U.S. at

323-31).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials

in its own pleadings.  See Fed. R. Civ. P. 56(e).  Rather, the nonmoving party must present specific

facts that demonstrate there is a genuine dispute over material facts.  Hairston, 9 F.3d at 918.  When

reviewing a motion for summary judgment, a court must examine the evidence in the light most

favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in

favor of the nonmoving party.  Id.

### *Declaratory Judgment Standard*

The claims in this proceeding are presented as a request for a declaration that King is not

liable to the Minnesota Parties and even if he is, those claims are dischargeable.  As noted above,

bankruptcy courts are among the federal courts that may grant declaratory relief under authority

of the Declaratory Judgment Act.  City of Central Falls v. Central Falls Teachers' Union (In re

City of Cent. Falls), 468 B.R. 36 (Bankr. D.R.I. 2012).

Consistent with the constitutional standing requirements of Article III, a plaintiff seeking

to establish entitlement to a declaratory judgment must demonstrate an "actual controversy" to the

court.  Malowney v. Fed. Collection Deposit Grp., 193 F.3d 1342, 1347 (11th Cir. 1999);

Declaratory Judgment Act, 28 U.S.C. § 2201.  The presence of an actual controversy within the

meaning of the Declaratory Judgment Act depends on "whether the facts alleged, under all the

circumstances, show that there is a substantial controversy, between parties having adverse legal

interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941) (citing Aetna Life Ins. Co. v.

Haworth, 300 U.S. 227, 239-42 (1937)).  Next, the plaintiff must prove that the conflict is ongoing.

Additionally, the plaintiff must show that the conduct is *actual,* not inferred, threatened, or

hypothetical.  Id.

This case involves a somewhat unusual request by the Debtor for a declaratory judgment

that he is not liable to the Minnesota Parties on their claims.  In Redmond v. Fowler Land Co., Inc.

(In re Alternate Fuels, Inc.), 2010 WL 3490260, at *3 (Bankr. D. Kan. Aug. 26, 2010), the

bankruptcy court considered similar facts and determined there was a case or controversy.  In

Alternate Fuels, Inc., a lawsuit was pending in state court when the debtor filed for relief under

Chapter 11, in large part to resolve its reclamation liability at issue in the state court proceeding

and pay claims.  The bankruptcy trustee filed an adversary proceeding against the state court

plaintiffs seeking a declaratory judgment on several of the issues raised in the state court

proceeding including the amount of damages suffered by the claimants.  The bankruptcy court said

there was no doubt that resolution of the issues raised in the adversary proceeding would impact

the administration of the bankruptcy estate as the allowance or disallowance of the proofs of claim

filed in the bankruptcy case depended, in part, upon issues to be determined in the adversary

proceeding.  The court concluded this amply showed there was an actual case or controversy.  Id.

at *5.  Similarly, in In re Loewenstein, 2020 WL 2114234, at *2–3 (Bankr. D. Idaho May 1, 2020),

the debtor requested a determination about the nature and extent of his obligation as to a specific

debt.  The court found the procedure, though awkward, was at bottom a claim objection and

concluded the debtor's adversary proceeding seeking a declaratory judgment was appropriate.

This adversary proceeding seeks resolution of a case or controversy as required by the

Declaratory Judgment Act.  Though the Minnesota Parties oppose summary judgment, they have

not done so on the basis that there does *not* exist an actual controversy or that declaratory relief is

not otherwise appropriate.  They just prefer the controversy be litigated elsewhere.  King has sufficiently shown an actual case or controversy on which summary judgment could be granted if the facts of the underlying controversy are undisputed such that he is entitled to judgment as a matter of law

### *Assertion of New Claims*

King argues the Minnesota Parties are asserting new claims in response to the Motion and they may not amend their complaint through argument in a brief opposing summary judgment.  More specifically, King contends the Minnesota Parties have shifted to an entirely new theory based on him allegedly misrepresenting that he was receiving no income when in fact he and his wife's company were receiving income from Wits Basin and concealing that Reichel's company received commissions on the loans made by investors.  This is evidenced by the response of the Minnesota Parties to the Debtor's Statement of Undisputed Facts Numbers 37-56, 60, 61, 63-67, 73-89.  Each of these statements addresses the operation of the XNS mine, the attempts to raise funds, King's expectations and understandings regarding mine operations, and the troubles Wits Basin had with reopening the mine.  In the state court complaint, attached to the counterclaim in this case, these and similar allegations were alleged to be false, so King addressed them in the Motion.  In response to each of these statements of undisputed facts, the Minnesota Parties stated:

> [I]t is not material to any claim.  Minnesota Creditors' claim is based on King spending Minnesota Creditors' invested money for undisclosed commissions and diversion to King's household expenses through CRM and not at the mine contrary to King's representations and omitted material facts such as payment of commissions.

A party cannot assert a whole new claim in response to summary judgment, and a claim that is raised for the first time in response to a motion for summary judgment is not properly before the court.  See Cutrera v. Bd. of Supervisors of La. State Univ., 429 F.3d 108, 113 (5th Cir. 2005);

see also Davis v. Cothern, 482 F. App'x 495, 497 (11th Cir. 2012) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.") (citing Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)).  At the summary judgment stage, the proper procedure for a party to assert a new claim is to amend the complaint (or, in this case, the counterclaim) in accordance with Fed. R. Civ. P. 15(a), and a court should disregard claims or theories of liability not in the complaint and raised first in a pleading opposing summary judgment. See DeFranceschi v. BAC Home Loans Servicing, L.P., 477 F. App'x. 200, 204 (5th Cir. 2012). This rule derives from the requirement that pleadings give the other side "'fair notice.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 698-99 (2009)).  "[I]f claims or theories 'are nowhere to be found in the complaint,' it would be unfair to require a defendant to defend against such claims or theories that it learns of, for the first time, during summary judgment." GlobeRanger Corp. v. Software AG, 2014 WL 4968053, at *2 (N.D. Tex. Oct. 6, 2014) (quoting DeFranceschi, 477 F. App'x. at 204).

A pleading, however, "need not specify in exact detail every possible theory of recovery—it must only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  Thrift v. Estate of Hubbard, 44 F.3d 348, 356 (5th Cir. 1995) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Even inartful pleadings may provide notice if they adequately allege a cause of action.  For example, in Thompson v. Thompson, 561 B.R. 581, 592 (Bankr. N.D. Ga. 2016), the court found the complaint did provide notice to the defendant where it was clear from the complaint plaintiff intended to assert a claim under section 727(d)(2), even if the section was not specifically listed in the complaint, because the complaint contained an allegation that fell within the scope of the subsection.

Further, Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary material listed in Rule 56(c) and a party opposing summary judgment must set forth facts showing a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324; Thomas v. Corwin, 483 F.3d 516, 526–527 (8th Cir. 2007) ("The party opposing summary judgment cannot rest solely on the pleadings, but instead must set forth specific facts showing there is a genuine issue of material fact for trial").  In addition to rebutting the movant's claims and proving that supposedly undisputed facts are actually disputed, the responsive statement may identify additional facts that the opposing party contends are relevant to the disposition of the motion.  11 Moore's Federal Practice - Civil § 56.81 (3d ed. 2020).

The Court finds King had fair notice of the Minnesota Parties' claims and the grounds on which they rest.  From the start, the Minnesota Parties have asserted claims based on fraud.  The theory on which their claim rests, that King allegedly funneled money invested by the Minnesota Parties' to pay commissions and divert funds to household expenses through CRM contrary to representations King supposedly made to the Minnesota Parties, is not entirely new.  Their first pleading in this adversary proceeding referenced diverting and funneling funds.  The Minnesota Parties alleged in the state court complaint, attached and incorporated by reference into their counterclaims, that "investor's money was not used—or was used to a limited degree—to benefit Wits Basin and was upon information and belief funneled to King."  Doc. No. 5 at 23 & 40. Further, the depositions submitted reveal this topic was covered and several of the parties were asked specific questions about whether Debtor received a salary and whether commissions were paid.  For example, Tadros, John Ortel, and Elizabeth Zbikowski all discussed the use of funds and whether King had made any statements about whether he was in fact receiving a salary.  The Court finds the Minnesota Parties are not changing the nature of their claim (fraud), but they are

28

instead changing the focus of their claim. King has had fair notice of both the Minnesota Parties' claims and the grounds on which they rest sufficient to warrant consideration now.

*__Analysis__*

King seeks a determination that the Minnesota Parties' claims are dischargeable. Determining the dischargeability of a debt under section 523 involves two steps. The first step is to determine whether a debt exists. If the debtor owes a debt to the plaintiff, the second step is to determine the nature of the debt—i.e. whether it is dischargeable or nondischargeable. In re Willoughby, 2017 WL 3741256, at *3 (Bankr. N.D. Ga. Aug. 30, 2017) (citing Hatfield v. Thompson (In re Thompson), 555 B.R. 1, 8 (10th Cir. BAP 2016); Stanbrough v. Valle (In re Valle), 469 B.R. 35, 43 (Bankr. D. Idaho 2012)). For King to meet the summary judgment standard, therefore, the undisputed facts and applicable law must establish either (1) King does not owe a debt to the Minnesota Parties or (2) any such debt is dischargeable under section 523.

"The establishment of the debt is determined through the adjudication of the underlying claim under applicable nonbankruptcy law." Van-Voegler v. Myrtle (In re Myrtle), 500 B.R. 441, 450 (Bankr. W.D. Va. 2013) (citing In re Valle, 469 B.R. at 43; see also Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000) (stating that "[t]he 'basic federal rule' in bankruptcy is that state law governs the substance of claims") (quoting Butner v. United States, 440 U.S. 48, 57 (1979)). The Minnesota Parties focus their argument on the nondischargeability of the debt. This, however, skips the first necessary step as they have not yet established that a debt is owed by King.

1. Breach of Contract

Count One of the Minnesota Parties state court complaint is for breach of contract. King is not personally liable on any of the contracts in question. All of the Notes are signed by Wits Basin and the signatures of King and Dacko on them are made in a representative capacity.

Moreover, a contract claim would not support a non-dischargeable claim. Failure to honor a promise is just a breach of contract, Reeves v. Davis (In re Davis), 638 F.3d 549, 554 (7th Cir. 2011), and "a breach of contract . . . creates only a dischargeable debt." Allen v. Freund, 2017 WL 2728432, at *4 (E.D. Wis. June 23, 2017); see also Schiller Ducanto & Fleck, LLP v. Potter (In re Potter), 2020 WL 3639927 (Bankr. N.D. Ill. July 6, 2020).

Accordingly, summary judgment is granted in favor of King on the Minnesota Parties' breach of contract claim.

2. Sale of unregistered securities

The Minnesota Parties allege King sold unregistered securities to them in violation of Minnesota law. The parties do not dispute that the Notes are securities under Minnesota law.[4]

Minn. Stat. § 80A.49 provides, in part, that it is unlawful for a person to offer or sell a security in Minnesota unless the security, transaction, or offer is exempted from registration under sections 80A.45 through 80A.47. Pursuant to Minn. Stat. § 80A.46 (13)(B), a sale to an accredited investor is an exempt transaction. Minn. Stat. § 80A.41(101(1)), in turn, defines an "accredited investor" to mean an accredited investor as the term is defined in Rule 501(a) of Regulation D adopted pursuant to the Securities Act of 1933. Regulation D provides "accredited investors" include:

> (5) Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $ 1,000,000.

> (6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

---

[4] The Cohan Trust Note dated October 2, 2014 provides it is governed by Wisconsin law, although the Note states it was made in Minnesota. The Minnesota Parties, including the Cohan Trust, asserted their claims under Minnesota law, so the Court will consider Minnesota law only.

(7)  Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); and

17 CFR 230.501.

It is undisputed each of the Minnesota Parties (along with any spouse) met the definition of an "accredited investor." Each individual had a net worth in excess of $1 million at the time they signed their respective Subscription Agreement, and the Cohan Trust had assets in excess of $5 million and was controlled by a sophisticated person at the time it signed each of its Subscription Agreements.  The Minnesota Parties admit they meet the definition of "accredited investors."  Any sale of a security to them, therefore, constituted an exempt transaction, and King cannot be liable for the sale of unregistered securities to the Minnesota Parties as a matter of law. Accordingly, summary judgment is granted in favor of King on this claim.

3.  Fraud in the Sale of Securities

The Minnesota Parties claim King is liable for several state securities violations.  First, they assert his liability arises directly under Minn. Stat. § 80A.68, Minnesota's counterpart to federal Rule 10b-5.  Second, they allege Wits Basin is liable under section 80A.76 as a seller of a security and that King is jointly and severally liable with Wits Basin as a control person and/or an aider and abettor of the fraud.  King disputes the allegations and asserts that the Minnesota Parties' claims and affidavits do not support their fraud claims with sufficient particularity to satisfy Rule 9.

As an initial matter, all securities transactions, even those exempt from registration, are subject to the antifraud provisions of Minnesota securities laws.  The Minnesota Securities Act is analogous to Federal securities law, Merry v. Prestige Capital Mkts., Ltd., 944 F. Supp. 2d 702, 709 (D. Minn. 2013), which is clear that transactions exempt from registration are not exempt from

antifraud provisions.  In <u>Landreth Timber Co. v. Landreth</u>, the Court stated "although § 4(2) of the

1933 Act, 15 U.S.C. § 77d(2), exempts transactions not involving any public offering from the

Act's registration provisions, there is no comparable exemption from the antifraud provisions."

471 U.S. 681, 692 (1985); <u>see also</u> <u>see also</u> <u>Vernon J. Rockler & Co. v. Graphic Enters., Inc.</u>, 52

F.R.D. 335, 341-42 (D. Minn. 1971) ("The court is cognizant of the fact that exemption from

registration under the 1933 Securities Act does not preclude liability under the antifraud provisions

of the securities laws."); <u>Faye L. Roth Revocable Tr. v. UBS Painewebber Inc.</u>, 323 F. Supp. 2d

1279, 1299 (S.D. Fla. 2004).  Therefore, the Minnesota Parties may seek recourse for fraud in

connection with the Notes even though they are exempt from registration.

        a.   *Pleading with Particularity*

The Minnesota Parties claim King is liable for securities fraud.  Conversely, King argues

the Minnesota Parties have not pled fraud with particularity in the counterclaim as required by

Fed. R. Bankr. P. 7009 or provided affidavits which satisfy the particularity requirement and,

accordingly, he is entitled to summary judgment on the fraud claims.  The Federal Rules govern

the adequacy of pleading even though the claim may be based on state law.  <u>See</u> <u>Selective Ins.</u>

<u>Co. v. Sela</u>, 353 F. Supp. 3d 847, 855 (D. Minn. 2018); <u>Johnson v. Hondo, Inc.</u>, 125 F.3d 408, 417

(7th Cir. 1997).

Rule 9(b) of the Federal Rules of Civil Procedure, made applicable to these proceedings

by Fed. R. Bankr. P. 7009, provides a party alleging fraud "must state with particularity the

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  General allegations of fraud are

insufficient to meet the requirements of Rule 9(b).  Rather, fraud allegations must specify such

matters as the time, place, speaker, and content of the misrepresentation.  <u>See</u> <u>Murr Plumbing, Inc.</u>

v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1069 (8th Cir. 1995). Simply reciting the elements of a claim is insufficient.

While the defense of failure to state a claim may be raised at summary judgment, see Wright & Miller, Federal Practice & Procedure § 1385 (3d ed. 2020) ("Rule 12(h)(2) permits the failure to state a claim defense to be asserted in . . . a motion for summary judgment."), courts express different opinions about whether failure to plead fraud with the particularity required under Rule 9, in and of itself, can be grounds for entry of summary judgment. Reid v. Hasty, 2009 WL 10711917, at *11 (N.D. Ga. Nov. 5, 2009), report and recommendation adopted as modified, 2010 WL 11647079 (N.D. Ga. Jan. 7, 2010). Some courts have granted summary judgment on fraud claims where the plaintiff failed to plead fraud with the requisite particularity. In these cases, though, the plaintiff did not respond to the motion for summary judgment or no allegations of fraud were made except the black letter requirements for a claim or no evidence was in the record to support the response. In Laifail, Inc. v. Learning 2000, Inc., 2002 WL 31667861, at *4 (D. Del. Nov. 25, 2002), for example, summary judgment was granted where plaintiff asserted a claim for fraudulent inducement but failed to identify in the complaint, with the required specificity, when, by whom, to whom, and under what circumstances, the alleged false statements were made. The plaintiff's response to the motion for summary judgment did not cite to any evidence in the record. Other courts have found, even if summary judgment is the proper stage to raise a Rule 9 issue, summary judgment is not appropriate when the evidence presented is particular. Similarly, summary judgment based on a failure to plead with particularity is not appropriate where the parties have conducted extensive discovery and are well aware of the basis of the claim. See Firstar Bank, N.A. v. Faul Chevrolet, Inc., 249 F. Supp. 2d 1029, 1043 (N.D. Ill. 2003); see also A.I. Credit Corp. v. Legion Ins. Co., 265 F.3d 630, 638 (7th Cir. 2001) (declining to analyze whether

33

plaintiff's fraud was pleaded with sufficiency because both sides squarely addressed fraud theory at the summary judgment stage).

Regardless of which approach is taken, the Court finds the Minnesota Parties pled claims of fraud and supported them with affidavits with sufficient particularity so as to warrant further consideration by the Court.  The state court complaints, which are incorporated in the counterclaim in this proceeding and in the Minnesota Parties' proof of claim, contain very specific allegations of misrepresentations including who made them, to whom, the nature of the misrepresentation, and why they were allegedly false.  The Court does not know if a failure to plead with particularity was raised by King in his answers to the state court litigation, but the Court notes that two of the cases were scheduled for trial within 10 days of King filing his bankruptcy petition, so it is unlikely any motion to dismiss on this ground would have been granted at that late stage of the case.  When the counterclaim was filed here, King did raise Rule 9 in his reply.  However, the issue was never pressed and, if it had been, it is likely the Court would have denied it since the state court complaints were detailed enough to withstand a motion to dismiss.

What King really complains about here is the new focus in the response to the Motion on representations he allegedly made regarding his compensation and use of funds.  These alleged statements are not outlined in the complaint to the extent King contends is necessary.  But, to the extent the complaint may not have outlined the who, what, when, and where of these specific allegations, the affidavits submitted by the Minnesota Parties are sufficient to fill in the blanks. The Affidavits answer the who (King and Reichel), the what (use of funds and payment of salaries and commissions), the to whom (each Minnesota Party directly or indirectly), the when (prior to investment), and the significance of the representation (the representation convinced the investor in part to make the investment).  While the exact dates of the alleged representations and the mode

of communication are not outlined, the Court concludes the information is sufficient to satisfy Rule 9, particularly at this late stage of the litigation and on summary judgment.

The Court also finds King has had adequate notice of the Minnesota Parties' fraud claims, demonstrated by his ability to file a detailed motion and reply in support of summary judgment. Like the court in <u>Firstar Bank, N.A.</u>, 249 F. Supp. 2d 1029, this Court sees no reason to determine whether fraudulent conduct was stated with sufficient particularity years ago when the Minnesota Parties first filed their claims since extensive discovery has resulted in evidence that is particular. The Court finds a liberal reading of the complaint, together with a review of the evidence and sworn statements filed by the Minnesota Parties, set forth the Minnesota Parties' claims with sufficient particularity and failure to satisfy Rule 9, in and of itself, is not grounds for the entry of summary judgment here.

### b. *Securities Fraud Liability Under Minn. Stat. § 80A.68*

The Minnesota Parties claim King is directly liable under the Minnesota Securities Act (Minn. Stat. §§ 80A.40-91) for committing securities fraud.

Minnesota securities law closely parallels federal securities laws. Section 80A.68, which defines fraud violations, is Minnesota's counterpart to Rule 10b-5 and the federal antifraud regulation. It makes it "unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:"

> (1) to employ a device, scheme, or artifice to defraud;
>
> (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make a statement made, in the light of the circumstances under which it is made, not misleading; or
>
> (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

Minn. Stat. § 80A.68.  As with federal law, a private cause of action is available under Minn. Stat. § 80A.68.  Smith v. Questar Capital Corp., 2013 WL 3990319, at *6 (D. Minn. Aug. 2, 2013).  An express cause of action for violating section 80A.68(b)(2) is provided in section 80A.76(b).  Robert Allen Taylor Co. v. United Cred. Recovery, 2016 WL 5640670, at *8 (Minn. Ct. App. 2016).

Federal and Minnesota state courts have held that because section 80A.68 of the Minnesota Securities Act is the state analogue to Rule 10b-5, it therefore requires the same substantive elements of proof.  Merry v. Prestige Capital Mkts., Ltd., 944 F. Supp. 2d 702, 709 (D. Minn. 2013); Robert Allen Taylor Co., 2016 WL 5640670, at *8.  A plaintiff asserting liability for securities fraud under Minn. Stat. § 80A.68 must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter or negligence; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  See Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc., 641 F.3d 1023, 1028 (8th Cir. 2011) (quoting Stoneridge Inv. Partners, LLC v. Sci-Atl., Inc., 552 U.S. 148, 157 (2008)); see also Merry, 944 F. Supp. 2d at 709 n.5 (citing Trooien v. Mansour, 608 F.3d 1020, 1028 (8th Cir. 2010) (claims arising under Minn. Stat. § 80A.68(2) "require only a showing of negligence.").  King focuses his attention on the alleged misrepresentations, reliance, and connection to the purchase of the security.

First, a claimant must prove the opposing party made a material misrepresentation or omission.  A viable securities fraud claim requires that the "defendant made a statement that was *misleading* as to a *material* fact."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011) (internal citation omitted).  To be material, the statement must create "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the total mix of information made available." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988)). On the one hand, information is material if it "would have assumed actual significance in the deliberations of the reasonable shareholder." K-Tel Int'l Sec. Litig. v. K-Tel Int'l (In Re K-Tel Int'l Sec. Litig.), 300 F.3d 881, 897 (8th Cir. 2002). On the other hand, a fact is immaterial "[w]here a reasonable investor could not have been swayed by the misrepresentation." Id. And "some statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them." Parnes, 122 F.3d at 547 (internal citations omitted). The question is whether a reasonable investor would have considered the misstatement or omitted information significant at the time.

The false representation must relate to a present or past fact and not to future facts or future conduct. A statement of opinion cannot form the basis of a fraud claim. See Mutsch v. Rigi, 430 N.W.2d 201, 204 (Minn. Ct. App. 1988). A claimant must prove the defendants' representations were false when made. Merry, 944 F. Supp. 2d at 710-11 (citing In re Buffets, Inc. Sec. Litig., 906 F. Supp. 1293, 1300 (D. Minn. 1995). "[I]t must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made." Vandeputte v. Soderholm, 216 N.W.2d 144, 147 (Minn. 1974). A promise to do a future act, however, coupled with a present intent not to fulfill the promise can form a basis for fraud when intended to create a belief the future event would occur. 20A2 Minn. Prac., Business Law Deskbook § 34:18.

In this case, the alleged misrepresentations fall into two categories: 1) the existence, operation and possible success of the mine and 2) the use of the funds loaned, including whether King and Reichel were receiving compensation. As discussed above, the first category was pled extensively in the state court complaint incorporated in the counterclaim in this proceeding. King

has submitted affidavits by him, Levy, and Humphray establishing with undisputed facts that the representations regarding the existence of the mine were true, the representations regarding the issues at the mine were true, and the representations regarding King's expectations for the mine were based on fact and reasonably held.  The Minnesota Parties did not dispute the facts stated in the affidavits and presented no contrary evidence.  In fact, they responded to the allegations by stating those allegations were no longer material as they were focused now only on the second category of representations regarding payments to King and Reichel.  Moreover, many of the allegations in the state court complaint and counterclaim involve representations as to future actions and future performance of the mine or Wits Basin.  Statements regarding expected performance of the mine are future statements and are at most puffery for which a party cannot recover for fraud.  Parnes, 122 F.3d at 547; see also In re NVE Corp. Sec. Litig., 551 F. Supp. 2d 871, 894 (D. Minn. 2007).  The undisputed facts show that, as a matter of law, the Minnesota Parties may not recover for fraud based on any allegations related to the mine, its existence, its operation, its performance, or King's expectations about it.

The second category of allegations, and the only ones still being pursued by the Minnesota Parties, are that King, directly or indirectly, represented to each of them that King and Reichel were not being paid.  The Minnesota Parties state in their affidavits: 1) King and Reichel represented the money invested was to be used to fund operations at an ore mine in China; 2) King and Reichel communicated that all money invested would be used to pay direct expenses at the mine to reopen it; 3) King and Reichel communicated that King was not taking or receiving any compensation in any form and would not receive any payment in any kind until the Notes were paid in full; and 4) King communicated that Reichel was not being paid any fees or commissions (collectively referred to as "Payment Allegations").  Because a promise to do a future act coupled

with a present intent not to fulfill the promise can form a basis for fraud, a statement by King that he would not take a salary, when he knew he was getting money from CRM and intended to mislead the Minnesota Parties about that point, could suffice.   Other of the alleged misrepresentations are more problematic for the Minnesota Parties.   It is possible for the representations regarding use of funds at the mine to be true while Wits Basin also paid King, his wife, and Reichel.   The undisputed facts are that over $2 million of additional funding was received by Wits Basin during the operative period from persons other than the Minnesota Parties.   Expert testimony would likely be necessary to establish that the Minnesota Parties' money was not used for the mine.

The Minnesota Parties allege many of the statements were made by Reichel.   Even if King did not make the alleged misstatements, he could be liable for participating in a scheme to defraud the Minnesota Parties using Reichel's misleading statements.   Minn. Stat. § 80A.68(1) and (3) broadly prohibit "any device, scheme, or artifice to defraud" and any "act, practice, or course of business" that operates as a fraud or deceit upon another person.   The language captures a wide range of conduct, see Lorenzo v. SEC, 139 S.Ct. 1094 (2019), and individuals may be liable when they substantially participate or are intricately involved in the fraud.   For example, courts have found individuals in roles similar to those held by King to be liable for disseminating false information with an intent to defraud.   See e.g., In re Cognizant Tech. Sols. Corp. Sec. Litig., 2020 WL 3026564, at *16-19 (D. N.J. June 5, 2020) (finding executive vice president and chief legal and corporate affairs officer responsible for disseminating false data).   Reviewing the evidence in the light most favorable to the Minnesota Parties, the facts are disputed as to whether Reichel made the representations independently or with King's knowledge.   Hairston, 9 F.3d at 918.   So, disputed

issues of fact remain as to whether King, or someone for whose acts he is liable, made the representations and omissions alleged.

The Minnesota Parties have submitted their affidavits swearing as to the materiality of these representations or omissions.  King disputes that these representations are material. Construing the evidence in the light most favorable to the Minnesota Parties, as the Court is required to do at the summary judgment stage, the Court finds that materiality of the representations is disputed.

Next, to satisfy the "in connection with" requirement of Minnesota state law, and the federal equivalent, "there must be a causal connection between a defendant's misstatements or omission and plaintiff's purchase."  Freschi v. Grand Coal Venture, 551 F. Supp. 1220, 1227 (S.D.N.Y. 1982).  The phrase "in connection with" has been interpreted to mean that the "fraud practiced must have been prior to or contemporaneous with the sale of the securities." Id. (quoting Kogan v. Nat'l Bank of N. Am., 402 F. Supp. 359, 361 (E.D.N.Y. 1975)).  Therefore, a causal connection cannot exist where the alleged misrepresentation or omission occurred *after* the purchase.  First Fed. Sav. & Loan Assoc. v. Oppenheim, Appel, Dixon & Co., 629 F. Supp. 427, 439 (S.D.N.Y. 1986) (emphasis added); Freschi, 551 F. Supp. at 1227; compare Arthur Young & Co. v. Reves, 937 F.2d 1310, 1327 (8th Cir. 1991); see also Davis v. Midwest Discount Sec., Inc., 439 N.W.2d 383, 387(Minn. App. 1989).

Reichel's affidavit states that he and King told the Minnesota Parties prior to their purchases that the money would be used to pay expenses to reopen the XNS Mine and that King was not drawing any salary.  The Minnesota Parties state in their affidavits that King and Reichel made such representations.  Although the affidavits do not state a specific date of the representations or specifically that the representation was made before the first or each purchase,

they do state that the representations convinced the Minnesota Parties to make the investments. Construing the evidence in the light most favorable to the Minnesota Parties, these affidavits are sufficient to create an issue of fact as to the connection between the representations and the purchase of securities.

To establish a claim for securities fraud, a claimant must also prove justifiable reliance upon a defendant's deceptive acts to ensure that there is a proper connection between the defendant's misrepresentation and the plaintiff's injury.  Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011); see also Stoneridge, 552 U.S. at 159.  Justifiable reliance is a subjective standard measured by the individual creditor's own capacity, knowledge, and information which may be fairly charged against it from facts within its observation.  City Bank & Trust Co. v. Vann (In re Vann), 67 F.3d 277, 283 (11th Cir. 1995).  Justifiable reliance is a less stringent standard than reasonable reliance.  Id.  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a [defendant's] statement and engaged in a relevant transaction . . . based on that specific misrepresentation."  Erica P. John Fund, 563 U.S. at 810.

King argues that even if the misrepresentation regarding use of funds was made, the Minnesota Parties are not entitled to rely on it and that any reliance was not justifiable.  King notes the Minnesota Parties continued to buy new Notes even when existing ones were in default.  He also points to provisions in the subscription agreements signed by the Minnesota Parties in which the Minnesota Parties stated they had "either alone or with the assistance of a professional advisor, sufficient knowledge and experience in financial and business matters" to "believe[] himself/herself (or itself) capable of evaluating the merits and risks of the prospective private placement to purchase the Securities and the suitability of an investment in the Company in light

of the investor's financial condition and investment needs, and legal, tax and accounting matters."

<u>See e.g.,</u> Doc. No. 36-26 at 47. Further, the Minnesota Parties acknowledged they "recognize[d]

that the purchase of the Securities and investment in the Company involves a high degree of risk,

including to but not limited to the risk of losing his/her/its entire investment in the Company" <u>id.,</u>

and had "been given full and complete information regarding [Wits Basin] and ha[d] utilized such

access." <u>Id</u>. at 48. Each Minnesota Party also made the following representation: "The Investor

has relied upon the advice of the Investor's legal counsel and accountants or other financial

advisors with respect to tax and other considerations relating to the purchase of Securities

hereunder. The Investor is not relying upon the Company with respect to the economic

considerations involved to make an investment decision in the Company and the purchase of the

Securities." <u>Id.</u>

　　　　Courts and circuits are split about whether an anti-reliance clause such as the above renders

reliance on extra-contractual representations unreasonable as a matter of law or whether an anti-

reliance provision is instead only evidence relevant in determining reliance. Some courts have

found that anti-reliance provisions can render reliance unreasonable as a matter of law. <u>See e.g.,</u>

<u>Jackvony v. RIHT Financial Corp.,</u> 873 F.2d 411 (1st Cir. 1989); <u>One-O-One Enterprises, Inc. v.</u>

<u>Caruso</u>, 848 F.2d 1283 (D.C. Cir. 1988); <u>Rissman v. Rissman</u>, 213 F.3d 381 (7th Cir. 2000). Other

courts have concluded that a non-reliance clause is evidence of the absence of justifiable reliance,

but it is not automatically dispositive even if the buyer is a sophisticated investor. <u>See e.g.,</u> <u>Brown</u>

<u>v. Earthboard Sports USA</u>, 481 F.3d 901 (6th Cir. 2007); <u>AES Corp. v. Dow Chemical Co.</u>, 325

F.3d 174 (3rd Cir. 2003); <u>Fin. Timing Publ'ns, Inc. v. Compugraphic Corp.,</u> 893 F.2d 936, 944

(8th Cir. 1990).

Under Minnesota law, an anti-reliance provision does not bar a finding of reliance as a matter of law.  See Fin. Timing Publ'ns, Inc. v. Compugraphic Corp., 893 F.2d 936, 944 (8th Cir. 1990).  General disclaimers are given no effect, and even fairly specific disclaimers typically create jury questions about reliance rather than negate reliance as a matter of law.  Randall v. Lady of Am. Franchise Corp., 532 F. Supp. 2d 1071, 1086 & n.10 (D. Minn. 2007).  As the court in Randall explained, "reliance under Minnesota law is necessarily fact-specific, because it must be assessed from the subjective perspective of the person allegedly defrauded, not from some objective viewpoint."  Id.; see also Clements Auto Co. v. Service Bureau Corp., 444 F.2d 169, 178 (8th Cir. 1971) (interpreting Minnesota law as holding "a general disclaimer clause is ineffective to negate reliance on even innocent misrepresentations").  The various nonreliance provisions are fairly general and, as the Minnesota Parties point out, they are about the riskiness of the investments, not whether the funds were being used by the mine as promised.  Construing the evidence in the light most favorable to the Minnesota Parties, the Court finds the facts are disputed as to whether reliance by them was justifiable.

A claimant must also establish scienter, that is, an "intent to deceive, manipulate, or defraud."  Harris v. Union Electric Co., 787 F.2d 355, 362 (8th Cir. 1986) (citations omitted), cert. denied, 479 U.S. 823 (1986).  The Eighth Circuit has held that claims arising under Minn. Stat. § 80A.68(2) "require only a showing of negligence."  Merry, 944 F. Supp. 2d at 709 n.5 (citing Trooien v. Mansour, 608 F.3d 1020, 1028 (8th Cir. 2010)).  King disputes he intended to defraud anyone.  But since the alleged misrepresentations are about this own income and that of his wife, the Minnesota Parties have submitted sufficient facts to support a conclusion that such statements were made with intent to defraud.  Moreover, since negligence is sufficient to establish securities fraud under Minnesota law, making statements about your own income, without reviewing the

facts, could be negligent. Disputed facts remain regarding scienter and summary judgment in King's favor is not proper.

The final factor is loss. It is undisputed that the Minnesota Parties paid money for the Notes and received nothing in return. But there is a substantial difference between the amount paid for the Note and the face amount of the Note (see Exhibit A, attached hereto). In most instances, the face amount of the Note was at least two times the consideration paid and sometimes even more. Since civil liability is implied under Minn. Stat. § 80A.68, the statute itself provides no guide for determining the measure of damages. The Court is not being asked to enter a monetary judgment but rather to deny the claims of the Minnesota Parties altogether, so it will not decide at this time the damages the Minnesota Parties could recover if they prevail on their claims.

Material facts remain as to whether the representations were made, whether they were false, whether they were material, whether the Minnesota Parties justifiably relied on them, and whether King acted with scienter or negligence. The Court cannot say, therefore, that as a matter of law King violated Minn. Stat. § 80A.68. To be clear, the only matter remaining for trial on the claim of fraud in the sale of securities under Minnesota law is whether the allegations regarding payments to King and Reichel support the claim. Such proof must be by the Minnesota Party and by the investment. Based on the Court's review of the record, it is possible some of the Minnesota Parties may be able to establish facts that others cannot, so it is critical that the evidence at trial be specific. No other allegations will be considered.

       *c.*   *Secondary Liability Under Minn. Stat. § 80A.76*

The Minnesota Parties also claim King is liable under the Minnesota Securities Act for aiding and abetting securities fraud committed by Wits Basin and as a control person of Wits Basin.

In addition to the catch-all fraud provision of Minn. Stat. § 80A.68, Minnesota law holds the seller

of a security liable if the sale was of an unregistered security or if the security was sold

> by means of an untrue statement of a material fact or an omission to state a material
> fact necessary in order to make the statement made, in light of the circumstances
> under which it is made, not misleading, the purchaser not knowing the untruth or
> omission and the seller not sustaining the burden of proof that the seller did not
> know and, in the exercise of reasonable care, could not have known of the untruth
> or omission.

Minn. Stat. § 80A.76.  So, liability for the seller is more limited under Minn. Stat. § 80A.76.

Section 80A.76 also expressly provides for a cause of action (Minn. Stat. § 80A.76(b)(1)-(3)),

unlike Minn. Stat. § 80A.68.  Moreover, while courts have held there is no secondary liability

under Minn. Stat. § 80A.68, section 80A.76 specifically allows it in certain circumstances.

If the seller is liable under Minn. Stat. § 80A.76, a control person may be jointly liable.

Minn. Stat. § 80A.76(g)(1).  "Control" is not defined in the statute, but it has been defined broadly

as the ability to influence the decision-making process of another.  Under Minn. Stat.

§ 80A.76(g)(2), a managing partner, executive officer, or director of an entity liable under Minn.

Stat. § 80A.76(b)-(f) are jointly liable with the entity unless they act in good faith and do not induce

acts constituting offenses.  To hold an individual secondarily liable as a control person, the

company's primary liability must first be established.  Smith, 2013 WL 3990319, at *7.  Then, the

plaintiff must establish the individual defendant actually participated in (i.e. exercised control

over) the operations of the company and that he possessed the power to control the specific

transaction or activity upon which the primary violation is predicated.  See Metge v. Baehler, 762

F.2d 621 (8th Cir. 1985), cert. denied sub nom. Metge v. Bankers Trust Co., 474 U.S. 1057 (1986).

Second, a person may be jointly and severally liable with the seller of a security if the

person aids or abets the fraud.  Minn. Stat. § 80A.76(g)(3).  Specifically,

an individual who is an employee of or associated with a person liable under subsections (b) through (f) and who materially aids the conduct giving rise to the liability [is jointly and severally liable], unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist . . . .

Minn. Stat. § 80A.76(g)(3). The Minnesota Supreme Court has adopted the following three-prong test to establish aiding and abetting violations:

(1) The existence of a securities law violation by the primary party, as opposed to the aiding and abetting party;

(2) Knowledge of the violation on the part of the aider and abetter; and

(3) "Substantial assistance" by the aider and abetter in the achievement of a primary violation.

Foley v. Allard, 427 N.W.2d 647, 650 (Minn. 1988). "[W]here there is a minimal showing of substantial assistance, a greater showing of scienter [of knowledge] is required." Foley, at 651 (citing Metge v. Baehler, 762 F.2d 621, 624 (8th Cir. 1985) cert. denied sub nom. Metge v. Bankers Trust Co., 474 U.S. 1057 (1986)). Further, "[s]ubstantial assistance" requires a showing of "substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff." Id.

Of course, to prove a claim for secondary liability under Minn. Stat. § 80A.76, a claimant must first establish the primary party's liability. See Smith, 2013 WL 3990319. Wits Basin is not before the Court, but Wits Basin need not be named as a defendant in order to sue King for aiding and abetting Wits Basin. Id. at *7 (D. Minn. Aug. 2, 2013) (citing Sheftelman v. N.L. Indus., Inc., 1985 WL 29951, at *5 (D.N.J. Feb. 1, 1985) (identifying the "need to prove a securities *violation* but in no way indicates that the primary *violator* need be named as a defendant")).

While the issue under Minn. Stat. § 80A.68 is whether King personally made the statements and omissions, the issue under Minn. Stat. § 80A.76 is whether Wits Basin did so. As a

corporation, Wits Basin can only act through its officers and agents, and it is liable for those acts. Davis v. Re-Trac Mfg. Corp., 276 Minn. 116 (1967). "The general rule is that the acts and knowledge of an agent acting within the scope of his agency are imputed to the agent's principal . . . [t]he principal is also liable for the agent's misrepresentations that cause pecuniary loss to a third party when the agent acts within the scope of his apparent authority." In re Maxwell Newspapers, 151 B.R. 63, 69 (Bankr. S.D.N.Y. 1993). Here, King was the president and CEO of Wits Basin, and any statements he made to obtain money for Wits Basin were made within his apparent authority. Similarly, Reichel's company, Marley, was paid by Wits Basin to find potential investors. As such, viewing the evidence in the light most favorable to the Minnesota Parties, it is possible all representations he made to investors on Wits Basin's behalf are also attributable to Wits Basin.

Here, it is undisputed King was the president, CEO, and a director of Wits Basin during the operative time 2012-2015. King qualifies as a control person under § 80A.76(g)(1) and as a person who can be liable under Minn. Stat. § 80A.76(g)(2). He certainly was aware of his conduct, but the facts are disputed as to whether he knew or could have known of Reichel's acts in all instances.

The Minnesota Parties also allege King aided and abetted Wits Basin's fraud. Virtually all of the Minnesota Parties' allegations of fraud are about King's conduct. If Wits Basin's fraud resulted from King's actions, he provided full assistance in the achievement of the securities fraud and was certainly aware of his own conduct. Again, his role in aiding Reichel is disputed in many instances.

As discussed above, material facts are disputed as to whether the representations or omissions were made, whether they were false, whether they were material, whether the securities

(the Notes) were sold as a result of them, and whether Wits Basin and/or King acted with scienter. Until these disputed issues of fact are determined, Wits Basin's liability under Minn. Stat. § 80A.76 cannot be determined and, thus, King's liability as a control person or aider or abettor cannot be determined and summary judgment is inappropriate.

4. <u>Common Law Fraud</u>

The Minnesota Parties allege King and Wits Basin committed common law fraud by making misrepresentations of material fact to the Minnesota Parties to induce them to invest their money in Wits Basin. The Minnesota Parties' claim of fraud does not allege whether King or Wits Basin allegedly acted with intent or negligence. King's state of mind is not mentioned at all in the Answer or Counterclaim.

Minnesota law recognizes distinct claims for fraudulent misrepresentation and negligent misrepresentation, but "a misrepresentation 'whether negligent or fraudulent, constitutes fraud under Minnesota law.'" <u>Loop Corp. v. McIlroy</u>, 2004 WL 2221619, at *2 (Minn. Ct. App. Oct. 5, 2004) (cites omitted); <u>Hardin Cnty. Sav. Bank v. Housing & Redevelopment Auth. of the City of Brainerd</u>, 821 N.W.2d 184, 191 (Minn. 2012); <u>see also</u> <u>Williams v. Tweed</u>, 520 N.W.2d 515, 517 (Minn. Ct. App. 1994) (recognizing three types of actionable frauds: reckless misrepresentation, negligent misrepresentation, and deceit). "Minnesota law does not require a finding of bad motive for a finding of fraud." <u>In re Gibson</u>, 521 B.R. 645, 654 (Bankr. W.D. Wis. 2014).

The elements of fraudulent misrepresentation are: (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffered

pecuniary damage as a result of the reliance.  See Hoyt Properties, Inc. v. Prod. Res. Group, LLC, 736 N.W.2d 313, 318 (Minn. 2007) (citation omitted); see also Robert Allen Taylor Co. v. United Credit Recovery, 2016 WL 5640670, at *6 n.10 (Minn. Ct. App. Oct. 3, 2016).  Fraudulent misrepresentation differs from negligent misrepresentation only by "the element of scienter required."  Loop Corp., 2004 WL 2221619, at *2.

The elements required to prove fraud under Minnesota law mirror those required to prove securities fraud, including the possibility that negligence, as opposed to intent, is sufficient.  King seeks summary judgment on the common law fraud claim using the same evidence the Court found insufficient to grant summary judgment to King on the securities fraud claim.  Issues of material fact remain including whether the alleged representations were made, whether they were false, whether they were material, and whether the Minnesota Parties relied on them.  Additionally, King's intent is subject to dispute.  While he denies any intent to defraud, a reading favorable to the Minnesota Parties could support his liability for fraudulent misrepresentation since the alleged misrepresentations included statements about his own use of Note proceeds of which he would necessarily be aware.  Of course, no intent to defraud is required for negligent misrepresentation, and King's hurdle of showing he was not at least negligent if he made untrue statements about his household income is significant.  All of these issues of fact preclude a finding, as a matter of law, that King did not commit fraud.  Accordingly, the Court denies the request for summary judgment on this claim.[5]

---

[5] As discussed above, Wits Basin could be liable for the acts of its agents acting within their apparent authority.  So, Wits Basin could be liable for any misrepresentations of King and Reichel under the construction of facts most favorable to the Minnesota Parties.

5. <u>Civil Theft</u>

The Minnesota Parties contend King is liable for civil theft under Minnesota law for taking money from them for his own benefit.

The Minnesota civil theft statute, Minnesota Statute § 604.14, states: "A person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater." Minn. Stat. 604.14, subd. 1. "The statute authorizes potent remedies: liability for the value of the property stolen and punitive damages in the same amount." <u>TCI Bus. Capital, Inc. v. Five Star Am. Die Casting, LLC</u>, 890 N.W.2d 423, 430 (Minn. Ct. App. 2017). While the statute appears to be intended primarily to provide for a recovery if merchandise or other property is stolen from a retail store, <u>id.</u>, it does not apply exclusively to tangible property and courts permit intangible funds to support claims of civil theft. <u>De Castro v. Castro</u>, 2018 WL 6026089, at *4 (D. Minn. Nov. 16, 2018) (citing <u>Waters v. Cafesjian</u>, 127 F. Supp. 3d 994, 995 (D. Minn. 2015) (finding statute applied to misappropriation of funds via wire transfer and bank deposits and granting summary judgment on civil theft claim arising from unlawful wire transfers)). "[T]he gist of the offense is the cheating and defrauding of another by deliberate artifice" and "[n]o single definition can cover the range of possibilities for the offense." <u>State v. Ruffin</u>, 158 N.W.2d 202, 205 (Minn. 1968).

The key word in the statute is "steals." The word is not defined in the statute, but it generally means "that a person wrongfully and surreptitiously takes another person's property for the purpose of keeping it or using it." <u>TCI Bus. Capital</u>, 890 N.W.2d at 431. "This definition makes clear that for a person to steal something, there must be some initial wrongful act in taking possession of the property." <u>Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.</u>, 896 N.W.2d 115, 126 (Minn. Ct. App. 2017). A civil theft claim also requires that a defendant wrongfully

intend to "keep" or "use" the personal property at issue.  Shimota v. Wegner, 2017 WL 4083145, at *5 (D. Minn. Sept. 14, 2017), aff'd, 759 F. App'x 539 (8th Cir. 2019).

Civil theft is distinct from conversion.  Tank v. Krusemark, 2019 WL 3776020, at *3 (Minn. Ct. App. Aug. 12, 2019).  Conversion is "an act of willful interference with [the personal property of another], done without lawful justification, by which any person entitled thereto is deprived of use and possession," and "the exercise of dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods."  TCI Bus. Capital, 890 N.W.2d at 430-31 (alteration in original) (quoting Christensen v. Milbank Ins. Co., 658 N.W.2d. 580, 585 (Minn. 2003)).  The primary distinction between "steal" and "convert" is that a person must wrongfully obtain possession to steal, but a person may be liable for conversion after rightfully obtaining possession of property.  Tank, 2019 WL 3776020, at *3 n.3.

Here it is undisputed that the money paid by the Minnesota Parties was paid to Wits Basin, not King.  The Minnesota Parties complain that Wits Basin, at King's direction, used all or some of the money to pay King, his wife, and Reichel.  So, the real actor is Wits Basin, not King.  Wits Basin incurs liability if it acted wrongfully in obtaining the money and wrongfully in disbursing the money.  Securities fraud or common law fraud can satisfy the "wrongful act" requirement of the civil theft statute.  See TCI Bus. Capital, Inc., 890 N.W.2d 423 (discussing requirement of wrongful act); Tank, 2019 WL 3776020, at *3 (same).  Wits Basin could therefore be liable for civil theft if it obtained the Minnesota Parties' funds through securities fraud or common law fraud and wrongfully intended to keep it or (in this case) use it for a wrongful purpose.

Here, the Minnesota Parties seek to hold King personally liable for civil theft.  An officer, director, or shareholder of a corporation generally will not be personally liable for the obligations of the corporation, except in certain limited circumstances.  Damon v. Groteboer, 937 F. Supp. 2d

1048, 1077, 1089 (D. Minn. 2013).  One such circumstance is when "an officer of a corporation

. . . takes part in the commission of a tort by the corporation."  Ellingson v. World Amusement

Serv. Ass'n, 222 N.W. 335, 339 (Minn. 1928); Ransom v. VFS, Inc., 918 F. Supp. 2d 888, 894 (D.

Minn. 2013).  Thus, an officer of a corporation may be liable for a corporation's taking of another's

property if the officer actually participated in the tortious transaction.  See Holzer v. Tonka Bay

Yachts and Marine Sales, 386 N.W.2d 285, 287 (Minn. Ct. App.1986), rev. den., (Minn. June 30,

1986); see also Arena Dev. Grp., LLC v. Naegele Commc'ns, Inc., 2008 WL 1924179, at *7 (D.

Minn. Apr. 29, 2008).

Reviewing the evidence in the light most favorable to the Minnesota Parties, the facts are

disputed as to whether Wits Basin committed securities fraud or common law fraud.  Most of the

evidence of fraud is based on representations King allegedly made on behalf of Wits Basin.  So, if

Wits Basin committed civil theft, King may be liable for it.  The facts are also disputed about

whether the money the Minnesota Parties invested went to King and whether King acted with the

requisite intent in taking a salary and paying commissions to Reichel.  Disputes also exist as to

what portion of each of the Minnesota Parties' investments would fairly be considered "stolen."

See Damon v. Groteboer, 937 F. Supp. 2d 1048, 1077 n.20 (D. Minn. 2013) (finding it was not

clear what portion of the purchase price would fairly be considered "stolen").  It is undisputed that

over $2 million in additional funds were raised by Wits Basin during the operative time period

from sources other than the Minnesota Parties.  Expert testimony will likely be necessary to trace

the income and expenses of Wits Basin to establish it was the Minnesota Parties' dollars that were

spent, even if they prove Wits Basin should not have made payments to King or his wife.

Therefore, the Court denies Debtor's motion for summary judgment on the Minnesota Parties'

civil theft claim.

6. <u>Dischargeability</u>

If it is established Debtor owes a debt to the Minnesota Parties, the second step is to determine if the debt is nondischargeable.  A presumption exists all debts owed by the debtor are dischargeable unless the party contending otherwise proves nondischargeability.  11 U.S.C. § 727(b).  The purpose of this "fresh start" is to protect the "honest but unfortunate" debtors.  <u>U.S. v. Fretz (In re Fretz)</u>, 244 F.3d 1323, 1326 (11th Cir. 2001).  Exceptions to discharge are, therefore, narrowly construed against the creditor and in favor of the debtor, and the burden is on the creditor to prove nondischargeability by a preponderance of the evidence.  <u>Grogan v. Garner</u>, 498 U.S. 279, 287-88 (1991); <u>St. Laurent v. Ambrose (In re St. Laurent)</u>, 991 F.2d 672, 680 (11th Cir. 1993).  In this case, King filed the complaint seeking a determination that even if he was liable on the Minnesota Parties claims the debts are dischargeable.

a. <u>*Section 523(a)(19)*</u>

The Minnesota Parties allege claims against King for fraud in the offer and sale of securities in violation of Minn. Stat. § 80A.68, for aiding or abetting and as a control person of Wits Basin, who allegedly violated Minn. Stat. § 80A.76 as a seller of securities, and for common law fraud in the sale of a security.  A determination of liability under any of these counts could form the basis for nondischargeability pursuant to section 523(a)(19).

Under 11 U.S.C. § 523(a)(19), certain debts created in connection with securities transactions are excepted from discharge.  Section 523(a)(19) provides that an individual debtor may not discharge a debt that

(A) is for—

    (i)    the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii)     common law fraud, deceit, or manipulation in connection with the
purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from—
(i)      any judgment, order, consent order, or decree entered in any Federal or
State judicial or administrative proceeding;
(ii)     any settlement agreement entered into by the debtor; or
(iii)    any court or administrative order for any damages, fine, penalty,
citation, restitutionary payment, disgorgement payment, attorney fee,
cost, or other payment owed by the debtor.

11 U.S.C. § 523(a)(19).  To be nondischargeable, the debt must be for violation of securities laws
and result from a judgment, order, consent order, decree or settlement agreement.  See Allen v.
Loughery (In re Loughery), 457 B.R. 904, 907 (Bankr. N.D. Ga. 2011).

If King is found liable for securities fraud under Minn. Stat. § 80A.68, for aiding or abetting
Wits Basin's fraud or as a control person of Wits Basin under Minn. Stat. § 80A.76, or for common
law fraud in connection with the issuance of the Notes, a security, section 523(a)(19) makes that
debt nondischargeable without further action.  Consequently, King is not entitled to summary
judgment that such claims are dischargeable.  This is true whether the determination of liability is
made by this Court or the state court.  See e.g., Holzhueter v. Groth (In re Holzhueter), 571 B.R.
812, 823 (Bankr. W.D. Wis. 2017) (holding that the text of section 523(a)(19) does not eliminate
a bankruptcy court's authority to reach a substantive decision on a securities claim); Tradex Glob.
Master Fund SPC, Ltd. v. Chui (In re Chui), 538 B.R. 793, 807 (Bankr. N.D. Cal. 2015)
(concluding that bankruptcy courts may enter judgments on securities claims).  This is also true
even if the standard for the underlying judgment is negligence as opposed to scienter.  Dorsch v.
Butler (In re Butler), 2017 WL 5151678, at *7 (Bankr. E.D. Wis. Nov. 6, 2017).

b.   *Section 523(a)(2)*

King also seeks summary judgment that any claims of the Minnesota Parties are
dischargeable under section 523(a)(2).  Section 523(a)(2) excepts from discharge claims for

54

"money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." 11 U.S.C. § 523(a)(2)(A).  Section 523(a)(2)(B) excepts from discharge debts obtained by the "use of a statement in writing that is materially false; respecting the debtor's or an insider's financial condition; on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and that the debtor caused to be made or published with intent to deceive."  11 U.S.C. § 523(a)(2)(B).  King argues that statements made to the Minnesota Parties are as to future events or puffery or as to financial condition but not in writing.  King may be correct, but it is irrelevant where, as here, liability arises in connection with the sale of a security.

As discussed above, any liability for King under the securities law or common law fraud related to the sale of a security would be nondischargeable under section 523(a)(19).  Even though the standard for nondischargeability under section 523(a)(19) is lower in some respects, if the liability arises from the sale of a security, it is nondischargeable.  For example, Minnesota securities law only requires negligence, while section 523(a)(2) requires intent to defraud. Securities fraud can be based on oral statements respecting financial condition, but section 523(a)(2)(B) would make debts based on such statements dischargeable.  Because debts arising under the Minnesota securities statute and common law fraud are nondischargeable under section 523(a)(19), the Court need not address the section 523(a)(2) allegations.

### c.  Section 523(a)(4)

King also seeks a determination any debts he may owe the Minnesota Parties are dischargeable as a matter of law pursuant to section 523(a)(4).  Section 523(a)(4) excepts from discharge debts for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or

larceny. 11 U.S.C. § 523(a)(4). As explained above, civil theft under Minnesota law requires that a defendant wrongfully intended to keep or use the claimant's property. See TCI Bus. Capital, 890 N.W.2d at 431. The Minnesota Parties' claim for civil theft could conceivably give rise to nondischargeability pursuant to section 523(a)(4) because the elements required to prove civil theft under Minnesota law mirror those required to prove larceny under section 523(a)(4).

The term "larceny" is not defined in the Bankruptcy Code, so the Court looks to federal common law. Bryant v. Lynch (In re Lynch), 315 B.R. 173, 179 (Bankr. D. Colo. 2004) (citations omitted). Larceny is proved under section 523(a)(4) if the debtor has wrongfully and with fraudulent intent taken property from its owner. Kaye v. Rose (In re Rose), 934 F.2d 901, 903 (7th Cir. 1991). Larceny, like civil theft, requires that the original taking of property be unlawful. See Wilson Family Foods, Inc. v. Brown (In re Brown), 457 B.R. 919, 926 (Bankr. M.D. Ga. 2011). Larceny also requires intent: a plaintiff must show that the defendant took property "with the intent to convert it or to permanently deprive the owner of it." Burke v. Riddle (In re Riddle), 2011 WL 2461896, at *4 (Bankr. N.D. Ga. Apr. 6, 2011) (citing Bennett v. Wright (In re Wright), 282 B.R. 510, 516 (Bankr. M.D. Ga. 2002)).[6] The charge of taking property in violation of another's rights falls clearly within the ambit of section 523(a)(4). See In re Jacobs, 243 B.R. 836 (Bankr. M.D. Fla. 2000); see also Flemm v. Trexler (In re Trexler), 528 B.R. 842, 850-51 (Bankr. N.D. Ga. 2015) (noting courts have found debts for civil theft non-dischargeable under section 523(a)(4)'s larceny exception); Smith v. Williams (In re Smith), 253 F.3d 703 (5th Cir. 2001).

As explained above, the facts are disputed as to the elements of the Minnesota Parties' civil theft claim. But, if King is found liable for civil theft under Minnesota law, the debt could be

---

[6] Embezzlement, on the other hand, is the fraudulent conversion of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. See Riddle, 2011 WL 2461896. It differs from larceny in that the original taking of the property was lawful or with the consent of the owner. Embezzlement also requires fraudulent intent. Id.

nondischargeable pursuant to section 523(a)(4).  Consequently, King is not entitled to summary judgment that the civil theft claim is dischargeable pursuant to section 523(a)(4).

Section 523(a)(4) also excludes from discharge debts obtained by fraud or defalcation while acting in a fiduciary capacity.  11 U.S.C. § 523(a)(4).  Section 523(a)(4) requires the debtor, acting as a fiduciary in accordance with an express or technical trust that existed prior to the wrongful act, commit an act of fraud or defalcation.  Thus, under section 523(a)(4), the debtor must owe a fiduciary duty to his or her creditors that pre-existed the act creating the debt.  Quaif v. Johnson, 4 F.3d 950, 954 (11th Cir. 1993).  Fiduciary is narrowly construed under section 523(a)(4).  "The Supreme Court has consistently held that the term 'fiduciary' is not to be construed expansively, but instead is intended to refer to 'technical' trusts."  Quaif, 4 F.3d at 953 (citing Davis v. Aetna Acceptance Co., 293 U.S. 328 (1934)); see also Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 391 (6th Cir. 2005) (noting the term "fiduciary capacity" is construed more narrowly in the context of section 523(a)(4) than in other circumstances).

A technical trust has been defined as "an express trust created by statute or contract that imposes trust-like duties on the defendant and that pre-exists the alleged defalcation."  Lewis v. Lowery (In re Lowery), 440 B.R. 914, 926 (Bankr. N.D. Ga. 2010).  "Mere friendship does not meet this standard, nor does an ordinary business relationship."  Id. (citing In re Ferland, 2010 WL 260058 (Bankr. M.D. Ga. June 21, 2010)).  Under Minnesota common law, "when a corporation is insolvent, or on the verge of insolvency, its directors and officers become fiduciaries of the corporate assets for the benefit of creditors."  Snyder Elec. Co. v. Fleming, 305 N.W.2d 863, 869 (1981).  However, "this alleged fiduciary capacity is not cognizable under § 523(a)(4)—it is not a technical trust or other fiduciary relation that 'call[s] for the imposition of the same high standard,'

nor does it have 'an existence independent of the debtor's wrong.'" In re Thompson, 686 F.3d 940, 946 (8th Cir. 2012) (citing In re Marchiando, 13 F.3d 1111, 1115 (7th Cir. 1994)).

The Minnesota Parties have not alleged facts to establish King was acting in a fiduciary capacity within the meaning of section 523(a)(4). While the law does not require formal words to create a trust, there must be a clear intention to create a trust. An ordinary business relationship does not qualify as a technical trust. The Minnesota Parties failed to allege King was acting in a fiduciary capacity in accordance with an express or technical trust; they failed to establish anything other than an ordinary business relationship. Accordingly, the Court finds there is no genuine issue of material fact; King did not commit fraud or defalcation while acting in a fiduciary capacity and summary judgment is appropriate in favor of King on this portion of the Minnesota Parties' section 523(a)(4) claim.

d.  *Section 523(a)(6)*

King also seeks a determination that any debts he may owe the Minnesota Parties are dischargeable as a matter of law pursuant to section 523(a)(6). [7] A debt is nondischargeable under section 523(a)(6) if it arises from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The Minnesota Parties' claim for civil theft could plausibly give rise to nondischargeability pursuant to section 523(a)(6) because the elements required to prove both civil theft under Minnesota law and willful and malicious injury pursuant to section 523(a)(6) are substantively the same.

Under Section 523(a)(6), a creditor must prove a willful and malicious injury. Willfulness is "an intentional or deliberate act, which is not done merely in reckless disregard of the rights of

---

[7] King contends section 523(a)(6) does not cover debts for general financial injury caused by fraud, which are covered under section 523(a)(2), and proceeding under section 523(a)(6) would render section 523(a)(2) meaningless. Because any liability for King under the securities law or common law fraud related to the sale of a security would be nondischargeable under section 523(a)(19), the Court is not addressing the section 523(a)(2) allegations and will not address this argument.

another." Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012) (citations omitted). "'Malicious' means 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" Id. (citation omitted). But the debtor, through his acts, must have actually intended the *injury*, "not merely . . . a deliberate or intentional *act* that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998). The plaintiff must show the debtor "had a subjective motive to inflict injury or believed his conduct was substantially certain to cause injury." Hot Shot Kids, Inc. v. Pervis (In re Pervis), 512 B.R. 348, 376 (Bankr. N.D. Ga. 2014). The debtor's subjective intent may be inferred from surrounding circumstances. Hot Shot Kids, Inc., 512 B.R. at 376. The definition of willful and malicious under the Bankruptcy Code is fairly covered by the Minnesota civil theft statute, which requires that a defendant wrongfully intended to keep or use the claimant's property. See TCI Bus. Capital, 890 N.W.2d at 431. Indeed, courts have found damages arising from a debtor's civil theft to be nondischargeable pursuant to section 523(a)(6). See Sunco Sales, Inc. v. Latch (In re Latch), 820 F.2d 1163 (11th Cir. 1987) (construing Florida's civil theft statute); see also Trexler, 528 B.R. at 851 (same).

While the facts are disputed as to the elements of the Minnesota Parties' civil theft claim, if King is found liable for civil theft under Minnesota law, the debt could be nondischargeable pursuant to section 523(a)(6). Accordingly, King is not entitled to summary judgment that the civil theft claim is dischargeable pursuant to section 523(a)(6).

### *Certification of Summary Judgment Order as Final Under Rule 54*

Fed. R. Civ. P. 54(b) governs the certification of judgments as final, stating in relevant part "[w]hen an action presents more than one claim for relief . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . .only if the court expressly determines that there is no just reason for delay." A court has authority to enter judgment under Rule 54(b)

*sua sponte*. <u>Intergraph Corp. v. Intel Corp.</u>, 253 F.3d 695, 699 (Fed. Cir. 2001).  To make a determination under Rule 54(b), courts must engage in a two-step process: first, making a determination that a "final judgment" has been entered, and second, finding that there is no just reason to delay certification of the final judgment.  <u>See</u> <u>Curtiss–Wright Corp. v. General Elec. Co.</u>, 446 U.S. 1, 7–8 (1980); <u>see also</u> <u>Lloyd Noland Found., Inc. v. Tenet Health Care Corp.</u>, 483 F.3d 773, 777 (11th Cir. 2007); <u>In re Thadikamalla</u>, 2012 WL 7009639, at *1 (Bankr. N.D. Ga. Dec. 18, 2012).

To qualify as a final judgment, "[i]t must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'"  <u>Curtiss–Wright Corp.</u>, 446 U.S. at 7 (quoting <u>Sears, Roebuck & Co. v. Mackey</u>, 351 U.S. 427, 436 (1956)). In other words, the judgment must fully dispose of a substantive claim that is separable from other claims in the proceeding.  <u>In re Douglas Asphalt Co.</u>, 2012 WL 423784, at *3 (Bankr. S.D. Ga. Jan. 13, 2012).  "Claims are separable when . . . different sorts of relief are sought."  <u>In re Southeast Banking Corp.</u>, 69 F.3d 1539, 1547 (11th Cir. 1995).

Pursuant to this Order, summary judgment is granted in favor of King on the Minnesota Parties' claims for breach of contract and sale of unregistered securities; claims related to the allegations regarding the mine, its existence, its operation, its performance, or King's expectations about it; and on the section 523(a)(4) claim as far as it relates to fraud or defalcation while acting in a fiduciary capacity.  The Order is the ultimate disposition of these claims, and these claims are independent of the remaining claims.  Therefore, the Court finds the Summary Judgment Order qualifies as a final judgment for the purpose of Rule 54(b).

The Court must next determine whether there is any just reason for delay. In making its determination, a court "must take into account judicial administrative interests as well as the equities involved." Curtiss–Wright Corp., 446 U.S. at 8. "Consideration of the former is necessary to assure that the application of the Rule effectively 'preserves the historic federal policy against piecemeal appeals.'" Id. (quoting Mackey, 351 U.S. at 438); see also Ebrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162, 167 (11th Cir. 1997) ("The federal concept of sound judicial administration and efficiency will not normally be furthered by [having piecemeal appeals].").

Here, the claims resolved in this Order are entirely separate from the claims that remain pending, and the factual and legal distinctions of the remaining claims are such that the same issues would not have to be decided more than once if appealed separately from the Order. Further, any appeal of this Order will not disturb or prejudice the remaining claims. The Court also finds that the equities favor entry of a final judgment. Once the findings in the Order are finalized, King will be fully released from litigation regarding the mine and from claims for breach of contract, for the sale of unregistered securities, and for fraud or defalcation while acting in a fiduciary capacity. It would be prejudicial to both the Minnesota Parties and King to wait for entirely unrelated claims to be resolved. Moreover, a Suggestion of Death has been filed, and finalizing the Order will allow the parties to proceed expeditiously in winding up King's bankruptcy and probate proceedings. Therefore, the Court finds there is no just reason for delaying the certification of this Order as final pursuant to Rule 54(b).

### ***Conclusion***

After hundreds of pages of motions, briefing, and evidence submitted in the record, and a sixty plus-page opinion, this case boils down to a straightforward factual issue: did King (or Reichel on King's behalf): 1) represent to each of the Minnesota Parties that King was not taking

or receiving any compensation and would not receive payment until the Notes were paid or 2) omit to disclose to each of the Minnesota Parties that Wits Basin was paying Reichel's company a commission.  If so, was the statement material and false, and did each Minnesota Party justifiably rely on it each time they provided money to Wits Basin?  Because of the varying interactions and communications between King and each Minnesota Party and the information available to each Minnesota Party over time, the outcome will be determined by the specific facts surrounding each investment.  The outcome may not be uniform as to all Minnesota Parties on all investments—that is the purpose of the trial.

Summary judgment is granted in favor of King on the Minnesota Parties' claims for breach of contract and sale of unregistered securities.  Summary judgment is granted to King on the Minnesota Parties' claims for security fraud and common law fraud and any claims related to the allegations regarding the mine, its existence, its operation, its performance, or King's expectations about it.  Summary judgment is also granted in favor of King regarding the Minnesota Parties' section 523(a)(4) claim as far as it relates to fraud or defalcation while acting in a fiduciary capacity.

King's request for summary judgment is denied as to the Minnesota Parties' claims for fraud in the sale of securities under Minn. Stat. § 80A.68, Minn. Stat. § 80A.76, and common law fraud related to the Payment Allegations (defined herein), and these are the only allegations which the Minnesota Parties may assert as a basis for these fraud claims.  Summary judgment is also denied as to the civil theft claim.  Genuine issues of material fact remain about these claims and, if established, these claims may be nondischargeable pursuant to sections 523(a)(19), (a)(4) (larceny), and (a)(6).

**<u>END OF ORDER</u>**

## EXHIBIT A: THE NOTES

| Payee | Date | Face Value | Amount Paid | Signatory for Wits Basin | Guarantor |
|---|---|---|---|---|---|
| Steve Cohan | 12/20/2013 | $30,000 | $15,000 | Stephen King | |
| Cohan Trust | 2/5/2014 | $20,000 | $10,000 | Stephen King | |
| Cohan Trust | 10/2/2014 | $100,000 | $50,000 | Stephen King | MXM |
| Cohan Trust | 4/30/2015 | $100,000 | $50,000 | Stephen King | MXM |
| Cohan Trust | 9/24/2014 | $18,713.58 | $9,356.79 | Stephen King | MXM |
| John Oertel | 9/5/2013 | $20,000 | $10,000 | Stephen King | |
| John Oertel | 11/1/2013 | $20,000 | $10,000 | Mark Dacko | |
| John Oertel | 12/10/2013 | $20,000 | $10,000 | Stephen King | |
| John Oertel | 1/20/2014 | $20,000 | $10,000 | Mark Dacko | |
| John Oertel | 11/20/2014 | $20,000 | $10,000 | Stephen King | MXM |
| John Oertel | 1/8/2015 | $40,000 | $10,000 | Stephen King | |
| Fred John Williams, Jr. | 11/12/2013 | $50,000 | $25,000 | Mark Dacko | |
| Fred John Williams, Jr. | 2/25/2014 | $50,000 | $25,000 | Stephen King | |
| Fred John Williams, Jr. | 4/22/2014 | $62,500 | $25,000 | Mark Dacko | |
| Julie Williams Barner | 4/22/2014 | $50,000 | $25,000 | Stephen King | |
| Fred John Williams, Jr. | 6/16/2014 | $62,500 | $25,000 | Stephen King | |
| Fred John Williams, Jr. | 7/1/2014 | $100,000 | Unknown | Stephen King | |
| Fred John Williams, Jr. | 12/26/2014 | $200,000 | $50,000 | Stephen King | |
| David L. Flod | 10/24/2013 | $100,000 | $50,000 | Mark Dacko | |
| David L. Flod | 2/10/2014 | $100,000 | $50,000 | Stephen King | |

| | | | | | |
|---|---|---|---|---|---|
| David L. Flod | 1/21/2015 | $100,000 | $25,000 | Stephen King | |
| Scott Zbikowski | 10/22/2013 | $50,000 | $25,000 | Mark Dacko | |
| Elizabeth Zbikowski | 10/22/2013 | $50,000 | $25,000 | Mark Dacko | |
| Scott & Elizabeth Zbikowski | 1/8/2014 | $100,000 | $50,000 | Mark Dacko | |
| Scott & Elizabeth Zbikowski | 5/16/2014 | $50,000 | $25,000 | Stephen King | |
| Scott & Elizabeth Zbikowski | 12/12/2014 | $40,000 | $20,000 | Stephen King | MXM |
| Edward J. Oertel | 12/19/2013 | $20,000 | $10,000 | Mark Dacko | |
| Edward J. Oertel | 3/3/2014 | $20,000 | $10,000 | Stephen King | |
| Edward J. Oertel | 6/23/2014 | $20,000 | $10,000 | Stephen King | |
| Edward J. Oertel | 3/15/2015 | $40,000 | $10,000 | Stephen King | MXM |
| Dan Skolness | 5/9/2013 | $100,000 | $50,000 | Stephen King | |
| Dan Skolness | 9/10/2013 | $100,000 | $50,000 | Mark Dacko | |
| Dan Skolness | 2/7/2014 | $200,000 | $100,000 | Stephen King | |
| Daljit Sikka | 9/12/2013 | $135,000 | $60,000 | Stephen King | |
| George M. Tadros & Reem Danial | 3/6/2013 | $70,000 | $35,000 | Stephen King | |
| George M. Tadros & Reem Danial | 4/22/2013 | $40,000 | $20,000 | Mark Dacko | |
| George M. Tadros & Reem Danial | 7/31/2013 | $105,000 | $50,000 | Stephen King | |
| George M. Tadros & Reem Danial | 8/22/2013 | $50,000 | $25,000 | Stephen King | |
| George M. Tadros & Reem Danial | 6/18/2014 | $50,000 | $25,000 | Stephen King | |

| George M. Tadros & Reem Danial | 1/16/2015 | $100,000 | $25,000 | Stephen King | |
|---|---|---|---|---|---|

## DISTRIBUTION LIST

**Phillip J. Ashfield**
Stinson LLP
50 South Sixth Street
Suite 2600
Minneapolis, MN 55402

**Bradley S. Wolff**
Swift Currie McGhee & Hiers
Suite 300
1355 Peachtree Street, N.E.
Atlanta, GA 30309-3231

**David S. Klein**
Rountree Leitman & Klein, LLC
Century Plaza I, Suite 175
2987 Clairmont Road
Atlanta, GA 30329

**William A. Rountree**
Rountree Leitman & Klein, LLC
Century Plaza I, Suite 175
2987 Clairmont Road
Atlanta, GA 30329